57 Cal.Rptr.3d 259 (2007)
149 Cal.App.4th 704
ADOPTION OP ARTHUR M., a Minor.
Sterling McG. et al., Plaintiffs and Respondents,
v.
Paul M., Defendant and Appellant.
Paul M., Plaintiff and Appellant,
v.
Meghan McG., Defendant and Respondent.
No. G037706.
Court of Appeal of California, Fourth District, Division Three.
April 10, 2007.
*261 Law Offices of Marjorie G. Fuller, Marjorie G. Fuller, Fullerton, J.E.T. Rutter, and Shara Beral Witkin, Irvine, in association with Kate M. Schreurs for Defendant and Appellant and Plaintiff and Appellant, Paul M.
Van Deusen, Youmans and Walmsley and Robert R. Walmsley, Santa Ana, for Plaintiffs and Respondents, Sterling McG. and Pamela McG.

*260 OPINION
IKOLA, J.
The central question in this case is whether an unwed father has a right to withhold his consent to the biological mother's decision to give up their child for adoption by a third party. We conclude the trial court properly found the father had not met the requirements of Adoption of Kelsey S. (1992) 1 Cal.4th 816, 4 Cal. Rptr.2d 615, 823 P.2d 1216 (Kelsey S.), as further explained in Adoption of Michael H. (1995) 10 Cal.4th 1043, 43 Cal.Rptr.2d 445, 898 P.2d 891 (Michael H.), i.e., he did not "show[ ] that he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child." (Id. at p. 1060, 43 Cal.Rptr.2d 445, 898 P.2d 891.) Consequently, *262 the tamer has no protected right allowing him to stand in the way of the child's adoption. We affirm the order dispensing with the need for father's consent, terminating his parental rights and responsibilities with respect to the child, and allowing the adoption to go forward.

FACTS
We recite the evidence in the light most favorable to the court's order, noting that the father's version of facts, summarized separately, post, contradicts that evidence in virtually every material respect.
Meghan McG. was 16 years old, in high school, and living with her parents when, on April 2, 2005, she had sexual intercourse with 17-year-old Paul M., a senior* from another high school. It was the only time the two had intercourse.
Meghan testified that in mid-May, after she had twice missed her menstrual period, she took a home pregnancy test, with a positive result. She called Paul before the end of May and told him about the pregnancy. Paul remained silent during the phone conversation as Meghan said she would have the baby and give it up for adoption. He did not deny paternity, nor did he ask Meghan if she needed anything. He did not offer to take her to the doctor. He did not offer to pay for medical care or otherwise help out financially. At the end of the phone call, he told Meghan, "Well, good luck with that."
Meghan said she and Paul did not speak again for a few weeks, although at some point, Paul left a message on Meghan's cell phone, asking her to have an abortion. Then, according to Meghan's testimony, on June 17, 2005, Paul came to her house, grabbed her by arm when she answered the door, and tried to pull her outside. one resisted, but agreed to speak to mm, and they went to the back patio of the house, where Paul confronted her gruffly when she refused to have an abortion. Meghan explained "due to personal convictions that I had that I did not feel comfortable with [abortion] and it was not a decision that I wanted to make," and Paul then "went on a little tirade," sprinkled with profanities, inter alia, calling Meghan a bitch and a slut and using the "f" word. He did not ask Meghan about how the pregnancy was going, although she volunteered to him that she had been "extremely nauseous and ... vomiting excessively." He did not ask her whether she needed help of any kind.[1] The conversation ended when Paul left, saying, "Get an abortion or else."
Meghan's version of the June 17 encounter was corroborated by her friend, Cody B., who personally witnessed it. According to Cody, Paul first "yanked" Meghan outside when she answered the door, then went with her to the back patio. Cody, in the adjacent kitchen with Meghan's little brother, saw Paul "up in [Meghan's] face" and heard him tell her, "I want you to have an abortion." When Meghan tried to explain why she intended to continue with the pregnancy, Cody heard Paul call her a "slut," "whore," and "bitch" and say she was an "idiot" and her decision not to have an abortion was "stupid."
Meghan did not see Paul again until after the baby was born, but they had a few July telephone conversations in which, according to Meghan, Paul always said "the same thing," that is, he talked only about abortion. Meghan, without a job or means to pay for doctor visits on her own, told Paul she had obtained emergency Medi-Cal coverage. Still, Paul did not *263 offer financial assistance, eventually, Meghan asked Paul to stop "badgering" her: She had already told him there was nothing he could do to make her get an abortion because she had no "legitimate health reason, like my life was in danger or something to that effect." Nonetheless, she testified, abortion was "all [Paul] seemed to be focused on, and that seemed to be his only motive or reason for speaking to me."
In a late July phone call, Meghan put her cell phone on speaker so two friends could hear the conversation. Paul again asked Meghan if she had gone to the doctor for an abortion. When she said she was not going to have an abortion, Paul asked, "Well, have you told your parents yet?" Meghan replied, "No, [what do] you care?" Paul said, "Well, you know, someone needs to knock some sense into you. I think that they will make you get [an abortion]. If you don't get into the doctor next week and get the abortion I am going to anonymously tell your parents."[2] Meghan protested that she alone had the right to decide when to tell her parents, but Paul said, "You have one week and you better get to the doctor."
Paul then moved to Boulder to attend the University of Colorado, and he remained there until January 2006. He acknowledged he wrote Meghan no letters, called her one time, in September 2005, and talked for a "couple of minutes," and had no face-to-face contact with her until March or April 2006, when he handed her a gift for the baby. According to Meghan, throughout the pregnancy, Paul offered her no emotional support, no friendship, and no assistance of any kind, except he volunteered to pay for the abortion which Meghan so steadfastly opposed.
In the meantime, within days of her last July phone conversation with Paul, Meghan, by then four months pregnant, stressed with nausea, intense vomiting, and a 15-pound weight loss,[3] taking double classes in school to graduate early so she could move on to college, and concerned about how disappointed her parents might be, finally told them that she was pregnant, she had contacted their church's adoption agency, L.D.S. Family Services, and she wanted to give the baby up for adoption.
Meghan's parents, Sterling and Pamela McG., were supportive of Meghan and arranged for her to see the obstetrician who had delivered her and her siblings. Meghan began receiving prenatal care, and in short order, she and her parents attended a meeting at L.D.S. Family Services, where the parents asked the counselor whether they could adopt the baby. Advised that the agency did not arrange kinship adoptions, but that a private attorney could do so, Sterling, Pamela, and Meghan decided on that course of action, and by the end of August, they had all agreed Meghan could proceed with her plan to attend college in Utah after the birth and Sterling and Pamela would pursue adoption.
In late September 2005, attorney David H. Baum sent a letter to Paul at his Boulder apartment, advising him he represented *264 sterling and Pamela in their intended adoption of the baby. Baum asked, inter aha, for Paul's waiver, as the alleged or presumed father, of any right to further notice of the adoption proceedings and advised Paul that by signing the documents, he would have no further parental or financial obligations toward the child and no further rights once the adoption placement was successfully completed. Paul's attorney promptly advised Baum that his client would not be signing the waiver. At the end of November 2005, when Meghan was eight months pregnant, Paul filed a petition naming Meghan as respondent and seeking to establish his parental relationship with the child and obtain legal and physical custody. He attested Meghan had "recently" told him of her pregnancy and of her belief he was the father.
Arthur M. was born about two weeks later, on December 13, 2005. Paul was informed of the birth on December 28, and on December 30, he sought an order to show cause re: child custody, visitation, and paternity testing. He attested he had been denied access to the child, which prevented him from establishing a parental relationship. He averred he was "extremely excited to assume [parental] responsibility" and was `Selling and ready to take this responsibility seriously."
Sterling and Pamela filed their adoption petition January 6, 2006. Under the box asking for "[a]ny further relevant facts" they alleged, "Mother herein believes & asserts that the pregnancy is a result of unconsensual & forced intercourse commits ted by Paul ... against mother. [Paul] used `date-rape' drugs in such undertaking. In addition, Respondent has failed to assume any parental responsibilities whatsoever towards the care of the child or with respect to the pregnancy."
The matters were consolidated and the parties stipulated to paternity testing. when testing established Paul was Arthur's biological father, Paul's attorney sent a letter to counsel for Sterling and Pamela, dated February 16, 2006, offering Paul's financial assistance. The letter stated, "My client would like to extend an offer of financial assistance to your client for Baby Arthur [F.R. McG.] relating to the above-referenced cases. My client has no way of contacting yours and would appreciate you conveying this offer of financial assistance to Meghan. He intended to do this at the time of the baby's birth, but was not notified that Arthur was born until the end of December 2005 and was therefore unable to communicate this offer directly to your client."
In April, the court denied Paul's request for interim visitation with Arthur and appointed counsel for the child. On June 14, 2006, in their first amended petition to determine the issues of Paul's parental rights and the necessity of his consent to the adoption, Sterling and Pamela alleged Paul was Arthur's natural father and deleted any reference to the alleged rape set forth in the original petition. They repeated the allegation that Paul had "failed to assume any parental responsibilities, financial, physical or emotional, with respect to the care and custody of the child and with respect to the pregnancy."

Paul's Testimony
The two-day trial commenced August 22, 2006. Much of the testimony has been summarized, ante. We now recite Paul's testimony, which contradicts that of Meghan's and her witnesses in virtually every aspect of any consequence.
Paul testified he and Meghan dated "probably less than a dozen" times, but had sexual intercourse only once. When advised of the pregnancy by a third party, he called Meghan to confirm the pregnancy and ask her to have a paternity test, *265 unaware that he would have to await the birth of the child. He was uncertain whether he was father because, he said, Meghan "told me she was dating a new guy from her new school, and I had known all the previous guys she had dated from Saint Margaret's. I knew she was pretty sexually active with all of them." Through August 2005, Paul "definitely had doubts, serious doubts" that he was the baby's father.
In May, when Meghan told Paul abortion was her only option,[4] he said he would support her in that decision if that was what she really wanted, but he never, ever, at any time during the pregnancy, suggested she have an abortion. Rather, he urged her over and over to tell her parents and go see a doctor. He offered to put her on his medical insurance, drive her to the doctor (Meghan did not have a driver's license), help her tell her parents about the pregnancy or even tell them all by himself so he could "take the brunt of it" and "be there for her, you know, no matter what." Meghan refused to let him help. She told Paul that due to her plans to attend school, she was considering placing the child for adoption. Even though Paul doubted he was the child's father, he offered to take care of the baby while Meghan was in college because he firmly believed a child should not be adopted unless the natural parents were incapable of providing for it. He told Meghan marriage was "definitely a possibility." When he left for college in Colorado, his doubts about his paternity "grew with the day."
Paul said that when he went to Colorado, he rented an apartment with an extra room for Meghan and the baby just in case Meghan's parents "kicked [her] out of her house and she would need somewhere to live right away." He did not testify he invited Meghan to come to Colorado or told her he had a room for her. Indeed, he had no contact with her in the six-month interval between the end of August 2005 and January 2006 other than one telephone conversation, on September 19, 2005, that lasted only a "couple of minutes." When, a few days later, he received Baum's September 23, 2005 letter seeking his waiver regarding the planned adoption, Paul stated he "called home. I asked my parents to retain representation for me in California immediately so I wouldn't lose any further rights." He then retained counsel who, on October 3, 2005, sent a letter to Baum stating Paul would not sign the waiver. The letter itself is not in the record, but a letter from Baum to Paul's attorney, dated October 7, 2005, states, inter alia, "I do not believe that there is any Court that would order pre-birth genetic testing (and we can't agree to pre-birth genetic testing because of the substantial risk of danger to the fetus and to Meghan), and absent genetic testing any custody action is, I would respectfully suggest, premature." Baum suggested genetic testing could take place "promptly after the baby is born." Thus, it reasonably can be inferred that Paul's attorney did, indeed, write to Baum and one of the topics covered was paternity testing. As noted, ante in November 2005, a few weeks before the baby's birth, Paul filed a petition to establish paternity and for custody of the yet unborn child, based on his understanding that Meghan was placing the baby for adoption by her parents.
Baum informed Paul of Arthur's birth on December 28, 2005, two weeks after the baby was born. Two days later, on December 30, 2005, Paul filed an order to *266 show cause requesting custody, visitation, and genetic testing, and declared he wanted to take responsibility for the child. In January, he took a semester off from college and moved back home with his parents. He got a job, and spent all his savings and college money on lawyers.[5] After receiving the results of the paternity test, Paul told everyone he was Arthur's father, sent a birth announcement and a handwritten note to his grandparents,[6] and had a baby blanket delivered to Meghan's house. He set up a room for the baby's nursery in his parents' house, bought a stroller, a car seat, baby toys, clothes and food, enrolled in parenting classes, and started investigating local preschools. He planned to live with his parents, continue paying rent, work his way through school, and establish a career so he could move out on his own with Arthur. He sent a letter to Meghan, offering to reimburse her for her medical costs, including insurance payments, but received no response.[7]

Issue of Rape Charges
We discuss the rape charges issue under its own heading because it is the focal point of Paul's argument that he was excused from promptly stepping up to the parental plate by circumstances beyond his control. In his briefs on appeal and again during oral argument, Paul's counsel vigorously attempted to convey the impression, albeit without alluding to specific calendar dates, that from late July 2005, a few days after the speaker-phone conversation with Meghan, and throughout the remainder of 2005, continuing into the early months of 2006, Paul could not assume the supportive role defined under the Kelsey S. and Michael H. standards because he feared criminal prosecution arising from Meghan's rape charges. We have thoroughly searched the entire record on appeal, the appellant's appendix and the reporter's transcript, and we have re-read Paul's briefs, carefully rechecking relevant record cites for the accuracy of references to evidence supporting the approximate seven-month time frame in which Paul contends he was willing, but unable, to do what otherwise would have been demanded of him. We have come up empty-handed. There is nothing in the record giving rise to a reasonable inference that Paul knew about the rape charges at any time before January 2006, after the baby's birth, when he read or was told of the allegations contained in Sterling and Pamela's original adoption petition. Our comprehensive recitation of the relevant record summarizes what it says and does not say on the issue of Paul's knowledge of rape charges and is necessary to put into proper perspective our discussion of Kelsey S. and Michael H.
Nowhere did Paul testify that he learned of the rape charges at any time in 2005. The only reasonable inference to be gleaned from the record in its entirety is that Paul first learned such charges existed after Sterling and Pamela's adoption petition was filed on January 6, 2006, stating Meghan's belief that Paul had forced her to have nonconsensual intercourse and may have given her a date rape drug. More specifically, Paul testified he was concerned there might be a criminal case pending because of "the things Meghan told me [at an unspecified time], allegations in the documents I was given [the January 6, 2006 petition], and the fact that *267 they filed with the D.A. [at an unspecified time]." He believed Meghan must have falsely told her parents he had drugged and raped her not because of anything he heard at any time in 2005, but because the parents stated these allegations in then-January 6, 2006 original adoption petition. Paul testified Meghan may have reported the charges to the local police because, according to her trial testimony in August 2006, she made a "covert call" to Paul in August 2005 "to see if [they] could get some kind of a confession out of him." There is no evidence, not even Paul's testimony, indicating he knew of the covert attempt to get his confession or that the police were monitoring the call from Meghan. Indeed, the very idea of a "covert" operation to obtain Paul's confession precludes an inference that anyone told Paul what was going on.
Paul testified he made no efforts to go to Meghan's home in 2006 or provide her or the child support because "I was advised not to." Paul was asked whether he ever attempted to contact Meghan or her parents once he realized he was the biological father, i.e., after the paternity results confirmed his paternity, which was sometime in or after March 2006. Paul testified he believed or "knew" at that time that "there was a potentially criminal action pending against" him. Paul also stated he was concerned about prosecution of a criminal action "as soon as the D.A. told me they tried to file," but there is no evidence as to when that event occurred. Likewise, Paul testified he hired a criminal attorney, but there is no evidence as to when that occurred. Paul stated he was advised by criminal counsel to stay away from Meghan and her parents, but there is no evidence as to when that advice was given. Paul said he took his lawyers' advice because he was afraid he would be charged with harassment if he attempted any contact with Meghan, but again, there is no time reference for that testimony. Paul said he feared criminal prosecution for, inter alia, rape, statutory rape, and rape by use of a drug, but he did not say that fear arose at any time in 2005, prior to the child's December birth. Moreover, nowhere in Paul's declarations supporting his parentage petitions is there any assertion that he stayed away from Meghan and her family during the pregnancy because of fear of criminal prosecution arising from rape charges or an investigation or advice of counsel, even though such a factual assertion, under oath, would have been highly relevant to his Kelsey S. and Michael H. argument for parental rights.
We note Paul testified he told his parents about Meghan's pregnancy 10 days after he learned of it himself, that is, in May 2005. He said his parents were concerned regarding the teenagers' relative ages, Paul being 17, Meghan 16. As Paul stated, "They [his parents] were a little surprised, yes, about our ages. They were also worried about any kind of criminal action." But he never testified that his parents' worries were based on any information regarding an actual investigation, nor did he testify his parents' worries caused him also to worry or to stay away from Meghan out of fear of criminal prosecution, and in point of fact, he had continuing contact with Meghan after his conversation with his parents, urging her to have an abortion throughout the next several months before he left for Colorado. Indeed, the fact that Paul was not fearful in the summer of 2005 is forcefully illustrated by his appearance at Meghan's house in June, where he and she had a heated discussion regarding abortion.
Of further interest, although not of evidentiary value, we note Paul's trial brief alludes to the rape charges only as follows: "Testimony in the present case will show that Meghan [McG.] refused to communicate *268 with Paul [M.] regarding whether or not she was indeed pregnant and whether or not she would go to a doctor. Furthermore, [Meghan's parents] then successfully prevented Paul [M.] from having access to Meghan [McG.] by alleging [in their original January 5, 2006 adoption petition] that the sex was unconsensual, an allegation now withdrawn as to these proceedings only." The trial brief further states, "Paul [M.] will testify as will his mother, Maria [M.], that his parents who he had told about these rumors [regarding the pregnancy and Paul's paternity] insisted that he stay away from Meghan [McG.] fearing her [potential] allegations would lead to him being arrested. The [M's] fears were confirmed when they received the [McG's] petition to dispense with his parental rights, and alleged in that pleading that the pregnancy was allegedly the result of unconsensual sex or date rape." (Italics added.) The trial brief further stated, "This allegation [in the petition] and fear that charges were pending forced Paul [M.] to hire a criminal attorney, Ron Brower. Throughout the proceeding [i.e., from January 5, 2006, when the adoption petition was filed] the threat of criminal prosecution has been held over Paul M.'s head to deter him from actively going to the [McG.'s] home or communicating with them. [¶] As a result of the criminal charges threatened and in fact filed [at an unspecified date] but rejected by the District Attorney of Orange County in June 2006, Paul [M.] has been forced to make all offers of assistance through counsel and has been forced to assert his fifth amendment rights." The trial brief also states, "[At an unspecified date], Meghan [McG.] file[d] a complaint against Paul M. with the District Attorney, contrary to testimony in the depositions of Sterling and Meghan [McG.] Those charges were being investigated immediately prior to the original court date in June 2006. The O.C. District attorney refuse[d] to prosecute Paul M."

The Court's Decision
At the conclusion of the trial, the court found Paul had failed to come forward promptly and assume his parental responsibilities. After a lengthy analysis of the Kelsey S. and Michael H. decisions and oral review of the testimony, the court stated, inter alia, "[T]he evidence, in my mind, indicates that you have not risen to the status where you had the rights as if you were the presumed father by providing the full emotional, financial and other support required of the parent, of a father for the mother and the child during the time that you knew of the mother's pregnancy to the time of the birth of the child, [thus you] have not achieved that status as a presumed father entitled to veto the adoption of this child." The court further commented, "You're asking for a paternity test.... [Y]ou're unsure. You haven't provided financial support. [B]y asking for an abortion, you're not providing emotional support. You're calling her names. That is not emotional support. That is emotional degradation." Noting Paul had gone away to school, "leaving the mother in the lurch," when he should have been "responsible to provide the financial, emotional and other support," such as "prenatal tests and possible doctor visits, going with [the mother] to some classes and so on," the court observed, "[Y]ou had a parental responsibility when you were in Colorado to provide for the child, but that's after the fact. And I believe there was testimony here that you would agree to pay for an abortion .... but that is not supportive of a mother who said from the outset that she was going to keep the child. That was her intention all along." Finding Paul did not achieve the status of presumed father able to veto the adoption under either statutory (Fam.Code, *269 § 7611)[8] or case law (Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216; Michael H., supra, 10 Cal.4th 1043, 43 Cal.Rptr.2d 445, 898 P.2d 891), the court ordered that Paul's consent to the adoption was not necessary, dismissed the paternity action, and allowed the adoption proceeding to go forward. Paul appeals.

DISCUSSION

Standard of Review
Arguing for an independent standard of review, Paul contends the dispositive facts are undisputed, that is, Paul failed to provide significant financial and emotional support to Meghan before Arthur's birth because he was afraid of Meghan's alleged rape charge. But "undisputed" signifies "settled" or "not open to dispute or question" (Webster's New World Diet. (3d college ed. (1988) p. 396, col. 2), and the word is inapt with regard to the asserted reason for Paul's actions or inactions, as should be apparent from our summary of the record relating to Paul's knowledge of the rape charge. Paul's testimony about his mental state was not undisputed, but merely (and not surprisingly) uncontradicted, and the trial court is not bound by uncontradicted evidence. (Beck Development Co. v. Southern Pacific Transportation Co. (1996) 44 Cal.App.4th 1160, 1204, 52 Cal.Rptr.2d 518) [factfinder may reject a witness's uncontradicted testimony if there is a rational ground for doing so].) Moreover, where uncontradicted testimony has been rejected by the trial court, it "cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." (Ibid.) That is not the case here. Thus, we find no basis for an independent review of the facts, but instead utilize the well established substantial evidence standard, under which we view all factual matters most favorably to the prevailing party and in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly. (Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429, 45 P.2d 183.)
Paul contends the appeal presents a mixed question of fact and law, and we have an independent duty to decide whether the facts fit within the parameters of the legal standards established by Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 and Michael H., supra, 10 Cal.4th 1043, 43 Cal.Rptr.2d 445, 898 P.2d 891. Our Supreme Court has stated that in considering a mixed question, the appellate court applies a mixed review, that is, it employs the substantial evidence test to the trial court's findings of fact and exercises its independent judgment in measuring those facts against a legal standard. (People v. Louis (1986) 42 Cal.3d 969, 984-985, 232 Cal.Rptr. 110, 728 P.2d 180, disapproved on other grounds in People v. Mickey (1991) 54 Cal.3d 612, 672, fn. 9, 286 Cal.Rptr. 801, 818 P.2d 84; see also Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 801, 35 Cal.Rptr.2d 418, 883 P.2d 960; CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority (2003) 108 Cal.App.4th 382, 391, 133 Cal.Rptr.2d 470; McGhan Medical Corp. v. Superior Court (1992) 11 Cal. App.4th 804, 809-810, 14 Cal.Rptr.2d 264.) In the final analysis, the point is somewhat academic in this case. The result is the same under either a deferential or independent review.

Statutory Presumed Father Status
Under California's statutory scheme, there are two classes of fathers: *270 Those who are presumed fathers, and those who are not. They are treated differently. Presumed fathers, like mothers, "usually have a statutory right to veto adoption by withholding consent regardless of what the court believes to be the child's best interest." (Michael H., supra, 10 Cal.4th at p. 1051, 43 Cal.Rptr.2d 445, 898 P.2d 891.) The Uniform Parentage Act of 1973(UPA) "provides a comprehensive scheme for judicial determination of paternity, and was intended to rationalize procedure, to eliminate constitutional infirmities in then existing state law, and to improve state systems of support enforcement." (Michael M. v. Giovanna F. (1992) 5 Cal.App.4th 1272, 1278, 7 Cal. Rptr.2d 460.)
"An unwed father's rights and duties under the UPA substantially depend on whether he is a `presumed father' within the meaning of section 7611." (Michael H., supra, 10 Cal.4th at pp. 1050-1051, 43 Cal.Rptr.2d 445, 898 P.2d 891.) In general, a man can achieve a presumed father status under section 7611, subdivisions (a) through (d), if he and the mother married or attempted to marry in a ceremony either before or after the birth or he "receives the child into his home and openly holds out the child as his natural child." (§ 7611, subd. (d).)
In an adoption proceeding, "[w]hether a biological father is a `presumed father' ... is critical to his parental rights." (Kelsey S., supra, 1 Cal.4th at p. 823, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) "If a man is a presumed father, a third party generally cannot adopt his child unless both he and the mother consent. [Citations.] If a man is not a presumed father, however, the situation is quite different. The mother's consent is still required in most cases [citation], but the father's consent is not required unless he successfully petitions to block the adoption and establish his legal status as the child's father. [Citations.] Even if he files such a petition, the adoption will proceed over his objection if either the mother or the party seeking to adopt the child successfully petitions for termination of his parental status. [Citation.] [¶] ... If ... the court finds that it is in the best interest of the child to be adopted by the prospective adoptive parents, it must enter an order stating that the father's consent is not required. [Citation.] This order also `terminates all [the father's] parental rights and responsibilities with respect to the child.'" (Michael H., supra, 10 Cal.4th at p. 1051, 43 Cal.Rptr.2d 445, 898 P.2d 891.) As our Supreme Court stated the cautionary rule in Kelsey S., supra, 1 Cal.4th at page 824, 4 Cal.Rptr.2d 615, 823 P.2d 1216, "The child's best interest is the sole criterion where there is no presumed father," and "the trial court's determination is frequently that the child's interests are better served by a third party adoption than by granting custody to the unwed natural father." (Italics added.)
Here, the court determined Paul is not a presumed father under section 7611. That determination is unimpeachable. Paul and Meghan never married or attempted to marry, and Paul has never taken Arthur into his home. Moreover, Paul stipulated at trial that he was not a presumed father as defined in the statute. His stipulation bars him from advancing the issue on appeal (see, e.g., Kardly v. State Farm Mut. Auto. Ins. Co. (1995) 31 Cal.App.4th 1746, 1750, 37 Cal. Rptr.2d 612), a principle to which he gives lip services while arguing we should deem him a constructive presumed father.
Constitutional Protection of Parental Rights Under Kelsey S. and Michael H.
Paul contends the court erred in finding he did not fall within the class of *271 fathers having constitutionally protected rights as enunciated by our Supreme Court in Kelsey S., supra, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216, and Michael H., supra, 10 Cal.4th 1043, 43 Cal. Rptr.2d 445, 898 P.2d 891. Those cases recognize "that an unwed father who has no statutory right to block a third party adoption by withholding consent may nevertheless have a constitutional right to do so under the due process and equal protection clauses of the Fourteenth Amendment and thereby to preserve his opportunity to develop a parental relationship with his child." (Michael H., supra, 10 Cal.4th at p. 1052, 43 Cal.Rptr.2d 445, 898 P.2d 891.) However, as further explained, "the unwed father's constitutional interest is merely inchoate [citation] and does not ripen into a constitutional right that he can assert to prevent adoption unless he proves that he has `promptly come[ ] forward and demonstrate[d] a full commitment to his parental responsibilities....' [Citation.] This is so because `the mere existence of a biological link does not merit ... constitutional protection' [citation]; rather, the federal Constitution protects only the parental relationship that the unwed father has actively developed by `"com[ing] forward to participate in the rearing of his child"` [citation] and `act[ing] as a father.'" (Ibid.)
Kelsey S. requires that in deciding whether a father is entitled to constitutional protection, the court should consider a number of facts, including, as relevant here, "[t]he father's conduct both before and after the child's birth." (Kelsey S., supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Under the Kelsey S. standard, "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilitiesemotional, financial, and otherwise his federal constitutional right to due process prohibits the termination of his paternal relationship absent a showing of his unfitness as a parent." (Ibid.) As more specifically explained, "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit." (Ibid.)
Michael H. leaves no doubt about what is required of the expectant father under Kelsey S: "[A]n unwed father has no federal constitutional right to withhold consent to an at-birth, third party adoption ... unless he shows that he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child." (Michael H., supra, 10 Cal.4th at p. 1060, 43 Cal. Rptr.2d 445, 898 P.2d 891.) The case also cautions that a father "cannot compensate for his failure to [promptly come forward to offer support] by attempting to assume his parental responsibilities many months after learning of the pregnancy." (Id. at p. 1054, 43 Cal.Rptr.2d 445, 898 P.2d 891.)
Paul argues he met the Kelsey S. and Michael H. standard, i.e., he did everything he possibly could in the way of offering financial, emotional, and other support, considering the circumstances of the criminal charges and Meghan's intransigent refusal to let him help her. He contends that as soon as he learned of Meghan's pregnancy in May 2005, he urged Meghan to see a doctor; he offered to pay her medical bills; he asked for paternity testing; he offered to help Meghan tell her parents about the pregnancy because he knew they would make sure she received the prenatal care he could not convince her to seek. He notes Meghan was only 16 years old, confused, distraught, and indecisive, *272 and when, by the end of July, she had still not obtained prenatal care, Paul was frantic with concern. He observes that suggesting abortion does not necessarily show lack of support for an unwed pregnant teenager, and he argues that, as a matter of law, proposing abortion is not a permissible ground for a failure-to-emotionally-support finding. (Not surprisingly, he cites no authority for this all-encompassing and suspect legal proposition.) Paul also notes he eventually stayed entirely away from Meghan because, as he puts it, he "would have to be a fool to contact Meghan or her family in any way" while the alleged rape charge was hanging over his head. He complains that even though Meghan and her parents decided on adoption as soon as Meghan disclosed her pregnancy, no one bothered to tell him anything, but as soon as he got Baum's letter, he promptly pursued his parental rights.
The problem with Paul's history of events is that it runs headlong into a record replete with conflicting testimony and contrary reasonable inferences regarding Paul's conduct and the spirit that moved him. In particular, the evidence regarding the rape charges and the reasonable inference that Paul did not know of those charges until January 2006 utterly vitiates his attempt to show that fear of criminal prosecution kept him from coming forward to take on his responsibilities during Meghan's pregnancy. With respect to the record in general, we need not repeat the facts summarized, ante, other than to note Meghan denied he provided any support at all during the pregnancy and testified he badgered her relentlessly about having an abortion and verbally abused her when she steadfastly refused. The trial court, looking at the record Paul now reconstructs for us, had a different focus than Paul: For instance, it noted his name-calling, i.e., "slut," "bitch," and "whore," and found that to be distinctly unsupportive and emotionally degrading. It did not agree that offering to pay for an abortion is supportive when the mother has said from the start that she intends to have the baby. It found Paul's departure for Colorado when Meghan was four months pregnant left her "in the lurch." It found Paul did not assist Meghan with medical appointments, did not attend any parental classes, did not pay any obstetrician bills or hospital bills, and made no payments to the pediatrician. It further found Paul did not attend prenatal classes or provide child support, even though he had-the ability to provide financial assistance to Meghan in all respects.
Paul asks us to revisit these determinations and refocus through his lens. We cannot. The question is whether the facts measured up against the Kelsey S. and Michael H. standard and demonstrated a parental relationship entitled to protection under the federal Constitution. The court was required to determine whether Paul took prompt action towards assuming responsibility from the time he knew of the pregnancy. We find no error in the court's conclusion that Paul fell short of the mark.[9]

Evidentiary Exclusions
Paul cites as reversible error the court's exclusion of (1) his testimony that Meghan told him abortion was her only option, (2) his testimony that he did not contact Meghan based on advice of counsel, (3) the contents of a handwritten note he enclosed with a baby announcement *273 sent to the paternal grandparents, and (4) the letter of Paul's attorney to Sterling and Pamela's attorney, offering Paul's financial assistance two months after Arthur's birth. The court excluded the evidence as hearsay (Evid.Code, § 1200), but none of the evidence was offered to prove the truth of the out-of-court statements, only that the statements were made. Thus, the evidence was not hearsay, and the court erred by excluding it.
However, Paul has failed to show a resulting miscarriage of justice, whether the rulings are considered separately or collectively. (Evid.Code, § 354.) None of the evidence went to the issue of Paul's failure to offer financial, emotional, or other support to Meghan during the first eight months of her pregnancy, which was clearly required under the "prompt" standard of Kelsey S. and Michael H.

Paul's Unfitness/Detriment Argument
We reject Paul's dual contentions that his inaction should not have prevented him from perfecting his parental rights in the absence of any showing of his unfitness or detriment to the child. He implores us not to apply Michael H. mechanically and argues it is his relationship to the child, not the mother, that matters. He asks us to "consider if it is not now time to recognize that fathers, wed or unwed, have a fundamental and protected right to parent their children, just like mothers do, absent some finding of unfitness." Whatever sense of inherent unfairness this argument might evoke, the short answer is that Paul's circumstances are governed by section 7664, under which no finding of detriment or parental unfitness is required, and existing case law adheres to the statute. Indeed, our Supreme Court emphasized in Kelsey S., supra, 1 Cal.4th at page 824, 4 Cal. Rptr.2d 615, 823 P.2d 1216, that "[t]he child's best interest is the sole criterion where there is no presumed father. (Italics added.) Paul's citation to the dissent in that opinion is of no avail, and his plea for reform is misdirected.

Fraud
Finally, in his opening brief, Paul repeats his trial court contention that the proposed adoption is a fraud on the court, "merely a sham, constructed by Meghan and her parents for the purpose of eliminating Paul's parental rights, and thus eliminating Paul from their lives." Paul speculates Meghan will continue to parent the child, and to prove the point, he cites Meghan's diary entry stating, "When I get married [the unborn child] will have more siblings and I'm going to let him decide if he wants to stay with grandpa and grandma or come live with me. He might have to be adopted so that he is safe. That way Paul can never come back and infringe into his life." But Meghan explained that her diary ramblings were no more than personal and private scribbling about her tumultuous emotional up's and down's during the pregnancy, and apparently, the trial court believed Meghan and concluded she was not engaged in fraud. We need say no more.

DISPOSITION
The order is affirmed. Sterling and Pamela shall recover their costs on appeal.
WE CONCUR: SILLS, P.J., and RYLAARSDAM, J.
NOTES
[1] Paul was not without resources. As of December 31, 2005, he had nearly $58,000 in one bank account, and as of January 26, 2006, $14,340 in another.
[2] Skylar S., a friend of Meghan, testified he witnessed the cell phone call. Paul's name appeared on the caller ID screen, and Skylar heard Paul ask, "Have you gotten an abortion yet?" to which Meghan responded, "I already told you, I am having the baby and giving it up for adoption." Paul then uttered "a couple of cuss words," including, "fuck," and said, "If you don't get an abortion within the next week. 1 will tell your parents anonymously about [the pregnancy]."
[3] Meghan was eventually treated for hyperemesis gravidarum, a condition characterized by severe nausea and vomiting, sometimes lasting the entire duration of a pregnancy, as it did with Meghan.
[4] The court found this testimony constituted inadmissible hearsay, a ruling Paul cites as error, as discussed more fully, post. Paul opined Meghan's vomiting was an attempt to "sell induce a miscarriage."
[5] As of the time of trial, Paul had paid $67,000 in attorney fees.
[6] The court excluded the note from evidence; Paul contends this was error.
[7] Paul challenges the court's exclusion of the letter.
[8] All further statutory references are to the Family Code unless otherwise stated.
[9] We see no need to dwell on Paul's excuses for his inaction, for example, his fear of the police, his attorney's advice to keep his distance, Meghan's refusal to accept help. These all require an assessment of Paul's credibility, a function we do not perform.