[No. A120844. First Dist., Div. Four. Dec. 22, 2008.]

Adoption of O.M., a Minor.
T.M. et al., Plaintiffs and Respondents, v.
B.R., Defendant and Appellant.

COUNSEL

Frank H. Free for Defendant and Appellant.

Law Office of Gradstein & Gorman, Seth F. Gorman and Marc Gradstein for
Plaintiffs and Respondents.

OPINION

**RUVOLO, P. J.—**

## I. INTRODUCTION

A biological father who does not qualify as a statutory presumed father, but
who also has not been shown to be an unfit parent, is constitutionally entitled

to prevent the termination of his parental rights if, as soon as he knew or should have known of the mother's pregnancy, he demonstrated a full commitment to his parental responsibilities. This entitlement may also exist when the father's attempt to demonstrate such a commitment is unilaterally frustrated by the child's mother.

In this case, a biological father's effort to assume his parental responsibilities was frustrated, in part, by the child's mother, who broke off their relationship and decided to relinquish the child for adoption. However, the father's ability to demonstrate his commitment was impeded to a far greater extent by the predictable consequences of his own criminal activity. Under these circumstances, we hold that the father did not make a showing of commitment to his parental responsibilities sufficient to entitle him to a hearing on his fitness before his parental rights could be terminated. Accordingly, we affirm the trial court's order granting the prospective adoptive parents' petition to terminate the biological father's parental rights.

## II. FACTS AND PROCEDURAL BACKGROUND

The minor who is the subject of this appeal is O.M.,[1] who was born in San Bernardino County on September 11, 2006. O.M.'s biological father is appellant B.R.,[2] who was 28 years old at the time of the hearing in the trial court. O.M.'s biological mother is a woman named L.T., who is not a party to this appeal. B.R. and L.T. knew each other for several years before O.M. was born, but were never married, and never lived together.

In February 2006, B.R. learned that L.T. had received a positive result on a home pregnancy test, and he took her to a medical clinic to confirm the result. L.T. was expected to deliver on or about October 17, 2006. B.R. was happy about the pregnancy, and he and L.T. discussed raising the child together. They told B.R.'s parents about the pregnancy, and they were also happy about it.

B.R. has a history of drug use, and between 1998 and 2006, he was convicted of numerous crimes, including possession of marijuana for sale;

---

[1] In order to protect the privacy of the minor (see Cal. Style Manual (4th ed. 2000) §§ 5:9, 5:10), and in accordance with the informal recommendation of the Reporter of Decisions, we refer to the parties and other persons mentioned in our opinion only by their initials.

[2] B.R.'s status as O.M.'s biological father was confirmed by DNA testing during the course of the proceedings in the trial court, and is not contested.

attempted kidnapping; criminal threats; vandalism; and various Vehicle Code violations.[3] He was on parole when he learned that L.T. was pregnant, but even after he took her to the clinic, he continued to use methamphetamine and marijuana, and avoided his parole officer because he knew he could not pass a drug test. About a week after L.T.'s pregnancy was confirmed, B.R. was arrested for a parole violation, which resulted in his being incarcerated for about four months.

While B.R. was incarcerated, he maintained contact with L.T. by telephone and e-mail, but did not provide her with any material support. She remained on good terms with his parents B.R., Sr.[4] and W.R., however, and they provided her with maternity clothes and some money. During this time, L.T. was arrested for shoplifting, and B.R.'s parents told her they would care for the child if she went to prison.

After B.R. was released from prison, around June 10, 2006, he saw L.T. at least once. At that time, B.R. stopped using drugs for a while. However, L.T. soon resumed her relationship with another man, who was the father of her older child, and began to avoid contact with B.R. He made some efforts to find her, both by physically searching for her and through mutual friends and her mother, A.T., but was unable to contact her. He did not give A.T. or any of L.T.'s friends any correspondence to transmit to L.T., however, and did not attempt to provide her with any money or material support through them, even though he was working and living with his parents at the time.

Meanwhile, respondents T.M. and J.R., who are O.M.'s current caretakers and his prospective adoptive parents, learned through an adoption facilitator that L.T. might be willing to surrender her baby to them, and contacted her in early July 2006. T.M. is a veterinarian, and J.R. is a registered nurse. They are residents of San Francisco, had been domestic partners for over seven years, and had decided to start a family by adopting a child. After making that decision, they contacted an adoption agency in 2005, and successfully completed its screening process for potential adoptive parents.

When T.M. and J.R. met with L.T. in July 2006, she told them that she was interested in placing her baby with a same-sex couple. She also told them, falsely, that she had gotten pregnant from a one-night stand at a party and was not in contact with the baby's father. During L.T.'s pregnancy, T.M. and J.R. helped her move into new housing, and gave her some financial assistance.

---

[3] The trial court took judicial notice of court records reflecting B.R.'s criminal convictions.

[4] Because B.R. and his father have the same initials, we will refer to B.R.'s father as B.R., Sr.

L.T. never talked to B.R. about giving up the baby for adoption, but in July or August 2006, he learned from A.T. that she was planning to do so. B.R. wanted to "have some say-so" over his child, and made an appointment with a lawyer to discuss the issue. By then, however, B.R. had begun using methamphetamine again. On August 6, 2006, the day before he was scheduled to meet with the lawyer, B.R. was arrested. He was charged with being a felon in possession of a handgun and ammunition, and possession of methamphetamine for sale. These crimes were alleged to have been committed on the day of his arrest.

On September 10, 2006, T.M. and J.R. learned that L.T. had gone into labor, and they immediately drove to the hospital, where they arrived before O.M. was born. After the birth, L.T. promptly relinquished O.M. to T.M. and J.R., who have had physical custody of him ever since. While L.T. was at the hospital, a friend of B.R.'s, who was dating L.T.'s sister, told B.R.'s parents that L.T. was about to give birth, and they rushed to the hospital. When L.T. saw them there, she confessed to T.M. and J.R. that she had deceived them about her relationship with the baby's father, and explained that he was in prison. She also told them that B.R. had not been very involved with her during the pregnancy.

Later that day, B.R. filed a petition asking the San Bernardino Superior Court to determine that he was the father of L.T.'s baby; to halt any adoption proceedings until his paternity was established; and to grant guardianship or visitation to B.R., Sr., and W.R.[5] T.M. and J.R. did not learn about the filing of these proceedings until about a month later. In the meantime, on September 25, 2006, T.M. and J.R. filed an adoption request, and a notice to terminate B.R.'s parental rights, in the San Francisco Superior Court.

While the adoption request was pending, B.R. entered into a plea bargain in the criminal case arising out of his arrest in August 2006, under which he received a sentence of 12 years in state prison. He is not scheduled to be released until January 9, 2016, by which time O.M. will be nine years old. Nonetheless, on November 1, 2006, B.R. filed an objection to the adoption in the San Francisco Superior Court proceedings, stating that he had not known of the adoption plan during L.T.'s pregnancy (a statement later contradicted by his own testimony), and that if his parental rights were not terminated, B.R., Sr., and W.R. would care for the child until B.R. was released from prison.[6]

---

[5] On November 3, 2006, B.R., Sr., and W.R. filed an adoption request in San Bernardino County. At some point, they also filed an application for temporary guardianship, which was denied by the San Francisco Superior Court. They are not parties to this appeal, however.

[6] B.R.'s parents confirmed this in their testimony at the hearing.

On January 15, 2008, the San Francisco Superior Court held a hearing regarding T.M. and J.R.'s request that B.R.'s parental rights be terminated, and that they be permitted to adopt O.M. At the hearing, an expert clinical psychologist testified that O.M. was securely attached to T.M. and J.R., and identified them as his parents. The psychologist opined that T.M. and J.R. were "very competent parents," and that O.M. would suffer serious trauma and detriment if he were removed from their custody and placed with B.R. Similarly, a social worker from the adoption agency testified that her post-placement visits with T.M. and J.R. had demonstrated that they were "wonderful parents" and that O.M. was healthy, happy, and well adjusted in their care, and very attached to them. She recommended that T.M. and J.R. be permitted to adopt O.M.

At the conclusion of the hearing, the trial court announced its decision, later memorialized in a written order, that B.R. did not qualify as a statutory presumed father, and was not entitled to the rights afforded to unmarried fathers by the *Kelsey S.* and *Michael H.* cases.[7] The court found by clear and convincing evidence that O.M.'s best interests would be served by terminating B.R.'s parental rights, and ordered that his adoption by T.M. and J.R. should proceed despite B.R.'s lack of consent. This timely appeal ensued.

## III.   DISCUSSION

■     Under the applicable statutory scheme in California (Fam. Code, §§ 7610–7612, 8604), the consent of a child's biological father is not needed for an adoption unless he has qualified as a presumed father. B.R. acknowledges that he is not entitled to statutory status as a presumed father. In arguing that his parental rights nonetheless should not have been terminated without a finding of unfitness, B.R. relies on the nonstatutory parental rights (*Kelsey S.* rights) established by *Kelsey S., supra*, 1 Cal.4th 816, and *Michael H., supra*, 10 Cal.4th 1043.

■     *Kelsey S.* rejected the contention that a biological father who is not married to the child's mother should be able to claim statutory presumed father status on the basis of "constructive receipt" of the child into his home, when his efforts to obtain custody are blocked by the mother. (*Kelsey S., supra*, 1 Cal.4th at pp. 829–830.) *Kelsey S.* also held, however, " 'that an unwed father who has no *statutory* right to block a third party adoption by withholding consent may nevertheless have a *constitutional* right to do so under the due process and equal protection clauses of the Fourteenth

---

[7] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*); *Adoption of Michael H.* (1995) 10 Cal.4th 1043 [43 Cal.Rptr.2d 445, 898 P.2d 891] (*Michael H.*).

Amendment and thereby to preserve his opportunity to develop a parental relationship with his child.' [Citation.]" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 719 [57 Cal.Rptr.3d 259], italics added (*Arthur M.*).)

The *Kelsey S.* holding was further elaborated in *Michael H., supra,* 10 Cal.4th 1043. In that case, the Supreme Court clarified that " 'the unwed father's constitutional interest is merely inchoate [citation] and does not ripen into a constitutional right that he can assert to prevent adoption unless he proves that he has "promptly come[ ] forward and demonstrate[d] a full commitment to his parental responsibilities . . . ." [Citation.] This is so because "the mere existence of a biological link does not merit . . . constitutional protection" [citation]; rather, the federal Constitution protects only the parental relationship that the unwed father has actively developed by " 'com[ing] forward to participate in the rearing of his child' " [citation] and "act[ing] as a father." ' [Citation.]" (*Arthur M., supra,* 149 Cal.App.4th at p. 719, italics omitted.)

■ "Under the *Kelsey S.* standard, '[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his paternal relationship absent a showing of his unfitness as a parent.' [Citation.] . . . 'Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and the circumstances permit.' [Citation.] [¶] *Michael H.* leaves no doubt about what is required of the expectant father under *Kelsey S.*: '[A]n unwed father has no federal constitutional right to withhold consent to an at-birth, third party adoption . . . unless he shows that *he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted* within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child.' [Citation.] The case also cautions that a father 'cannot compensate for his failure to [promptly come forward to offer support] by attempting to assume his parental responsibilities many months after learning of the pregnancy.' [Citation.]" (*Arthur M., supra,* 149 Cal.App.4th at pp. 719–720, italics added & omitted.)

■ The burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights. (Cf. *In re T.R.* (2005) 132 Cal.App.4th 1202, 1210 [34 Cal.Rptr.3d 215] [man seeking status of statutory presumed father has burden of proof].) In reviewing the trial court's implied factual findings here with respect to whether B.R. met this burden, we apply

the substantial evidence test.[8] (*Arthur M., supra*, 149 Cal.App.4th at p. 717.) To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard. (*Id.* at pp. 717–718.)

B.R. does not contend that he actually met the criteria set forth in *Michael H.* Rather, he contends that he should be excused from doing so, because his efforts to maintain contact with L.T. and gain legal custody of O.M. after his birth were blocked by L.T.'s refusal to see him after the first four or five months of her pregnancy. In so arguing, he relies on the Supreme Court's holding in *Kelsey S.* that the statutory scheme governing unwed biological fathers' rights "violates . . . equal protection and due process . . . to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father . . . ." (*Kelsey S., supra*, 1 Cal.4th at p. 849, italics omitted.)

In the present case, however, it was not L.T.'s unilateral action alone that prevented B.R. from meeting the requirements necessary to acquire *Kelsey S.* rights. One of those requirements is that "[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) Here, B.R. learned of the pregnancy in February 2006, and L.T. did not start refusing to see him at least until sometime in June 2006. B.R. has not established that during the intervening four months, he provided support to L.T. of any kind—financial, emotional, or practical. All he has shown is that his *parents* furnished her with some clothing and money, though apparently not enough to prevent her from needing the support of T.M. and J.R. once they came into the picture.

The record supports the conclusion that B.R. was prevented from supporting L.T. during the initial period of her pregnancy, before she began refusing to see him, not because of any unilateral action on her part, but by his own actions in committing the parole violations, including the use of illegal drugs, that led to his incarceration. We do not discern any violation of equal protection or due process in holding an unwed father's own criminal activity against him when assessing whether he has met the criteria for *Kelsey S.* rights.

Even after B.R.'s release from incarceration on June 10, 2006, the record does not reflect any significant effort on his part to assume the mantle of

---

[8] Because the sole issue in this case is whether B.R. met his burden of proof under *Kelsey S.* and *Michael H.*, it is irrelevant whether the financial assistance provided to L.T. during her pregnancy by T.M. and J.R. went beyond what is legally permissible. The trial court properly treated the issue as irrelevant.

responsible fatherhood notwithstanding L.T.'s repudiation of him. He was working and living with his parents, yet he admittedly made no attempt to furnish L.T. with any money or material support, despite his ability to get messages to her through L.T.'s mother and their mutual friends. Once B.R. learned that L.T. planned to relinquish the baby for adoption, he did promptly attempt to consult an attorney so as to assert his legal rights. By then, however, he had begun using drugs again, and had illegally taken possession of a handgun and ammunition. As a result of this conduct, B.R. was arrested again, and pleaded guilty to charges that resulted in a 12-year prison sentence.

In short, L.T.'s refusal to communicate with B.R. played only a relatively small role in his failure to qualify for *Kelsey S.* rights. Far more of the responsibility lies with B.R.'s own actions in violating the law. Thus, on the facts, this is not a case in which a biological father has become entitled to *Kelsey S.* rights by making good faith attempts to fulfill his parental responsibilities, only to have those attempts frustrated by the unilateral actions of his child's mother.

Contrary to B.R.'s argument in his reply brief, the foregoing conclusion does not amount to a procedurally improper and premature finding of parental unfitness, as defined by Family Code sections 7822–7829. Rather, it represents a determination that the rationale underlying the *Kelsey S.* requirements, and particularly the need for timely provision to unwed mothers of "emotional, financial, medical, or other assistance during pregnancy" (*Michael H., supra,* 10 Cal.4th at p. 1055), militates against affording *Kelsey S.* rights to a biological father who has precluded himself from even attempting to provide such support, through his own voluntary involvement in criminal behavior.

This conclusion is also in accord with the *Kelsey S.* court's statement that in order to be entitled to equal protection of his parental rights, an unwed father must, "[i]n particular, . . . demonstrate 'a willingness *himself* to assume *full* custody of the child-not merely to block adoption by others.' [Citation.]" (*Kelsey S., supra,* 1 Cal.4th at p. 849, italics added.) In the present case, B.R. does not seek to assume full custody of O.M. himself. Rather, he seeks to obtain only legal custody, while relegating physical custody to his parents until he is released from his present lengthy incarceration. Such a result would not serve the interest in "stability and continuity in a child's family life," which has also been identified as an important public policy in the *Kelsey S.* context. (*Michael H., supra,* 10 Cal.4th at p. 1057.)

We acknowledge that a number of juvenile dependency cases, several of which are cited in B.R.'s opening brief, have upheld the rights of incarcerated parents to retain legal custody of their children if they can arrange for their

children's care during their incarceration. None of these cases, however, has held that a father who has never been in a position to form a bond with his child in the first place, due to his incarceration, should be relieved from the requirements that fathers must meet in order to be entitled to *Kelsey S.* rights. Rather, all but one of these cases involved parents who had already established legal and at least joint physical custody of their children, but whose ability to retain physical custody was interrupted by the parent's incarceration.

For example, the father whose rights were upheld in *In re Isayah C.* (2004) 118 Cal.App.4th 684 [13 Cal.Rptr.3d 198] had successfully reunified with child during earlier dependency proceedings; had been awarded joint legal custody of the child; and had been given physical custody of the child by the dependency court, after the child was removed from the mother, two weeks prior to his arrest. *In re S.D.* (2002) 99 Cal.App.4th 1068 [121 Cal.Rptr.2d 518] and *In re Brittany S.* (1993) 17 Cal.App.4th 1399 [22 Cal.Rptr.2d 50] both involved two year olds who had been in the custody of their parents from birth until the parents were arrested and incarcerated. In *In re Aaron S.* (1991) 228 Cal.App.3d 202 [278 Cal.Rptr. 861], a pre-*Kelsey S.* case, the opinion confirmed an incarcerated father's right to have a juvenile dependency proceeding dismissed upon a showing that he could arrange care for his child until he was released; the father's legal status as the child's parent was simply assumed, and was apparently not at issue in the case.

The only case cited by B.R. in which a biological parent was treated as a legal parent even though the parent was incarcerated when the child was born is *In re Monica C.* (1994) 31 Cal.App.4th 296 [36 Cal.Rptr.2d 910] (*Monica C.*). That case involved a mother who was pregnant when she was first incarcerated, and still in prison when she gave birth. She therefore had to relinquish physical custody of the child temporarily as a newborn. *Monica C.* is distinguishable from the present case, however. In that case, the mother had physical custody of the child for most of a year between the date of her release and the date she was incarcerated for a third time, albeit with a four-month interruption due to a second, interim, incarceration. Thus, *In re Monica C.* provides no support for affording *Kelsey S.* rights to an incarcerated father who has never had physical or legal custody of his child, and will not be in a position to exercise physical custody until the child is at least nine years old.

## V. DISPOSITION

The trial court's order is affirmed. Respondents are awarded their costs on appeal.

Reardon, J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 22, 2009, S171329. Corrigan, J., did not participate therein.