Filed 11/1/23  In re L.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re L.S., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D082294 |
| Plaintiff and Respondent, | (Super. Ct. No. J520665) |
| v. | |
| M.T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

Defendant M.T. (Mother) appeals from the juvenile court's order terminating her parental rights as to her son, L.S. under Welfare and Institutions Code[1] section 322.26. Her sole contention is that the court should have applied the beneficial parent-child relationship exception to adoption, pursuant to section 366.26, subdivision (c)(1)(B)(i). We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petition

In January 2021, the Agency received a report of a serious car accident in which the vehicle went down an embankment and overturned with then five-year-old L.S. in the car. Mother was driving. L.S.'s father (Father)[2] was also present. They were both intoxicated and admitted consuming alcohol and engaging in a verbal argument that contributed to the accident. No one suffered major injuries but Mother and L.S. were transported to a hospital to address minor injuries and pain.

Mother was initially arrested but then released at the hospital. Once L.S. was medically cleared, he was released to Father's care. Three days later, the Agency observed the family's home in disarray with broken or missing windows covered in plywood, the front door being held closed by a stretch cord, and empty alcohol bottles in the front yard. A neighbor reported that there was "a ton of alcohol use" and that she constantly heard people in the family home using profanity and being verbally abusive.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    Father's parental rights were also terminated. He is not a party to this appeal.

2

Paternal grandfather explained that Mother and Father have a lot of issues that are exacerbated by drug and alcohol use. He reported Father uses marijuana and Adderall, and has tested positive for amphetamines. Mother has also used methamphetamine. L.S. did not suffer physically, but paternal grandfather noticed psychological effects. He shared that from when L.S. was "a little boy," Mother and Father would scream and yell at him if he was being too loud or interrupting, and there is still "a lot of yelling and cussing" at L.S.

The Agency attempted to mitigate the safety concerns by offering voluntary services, but ultimately filed a petition in February 2021, under section 300, subdivision (b), alleging L.S. was at substantial risk of harm due to Mother's and Father's substance abuse. Mother and Father agreed to a safety plan for L.S. to stay in the home of paternal grandparents, and to not have unsupervised contact with L.S.

## B. Jurisdiction and Disposition Period

The Agency reported that the family had prior child welfare referrals related to alcohol abuse and domestic violence. In October 2018, there was a substantiated referral for general neglect after Father hit Mother in the head with a plastic water pitcher while then two-year-old L.S. was present. It was reported that L.S. was present on numerous occasions when there were large parties and other incidents of at least verbal domestic abuse.

Paternal grandfather reported that over the past few years, L.S. expressed that he does not want to see fighting anymore. When Mother and Father yell at each other, sometimes L.S. would "wind[ ] up in the middle of it" or step in and tell them to stop, and act like a "marriage moderator." Paternal grandmother agreed that L.S. has "seen a lot of fights" and would be the "mediator."

L.S. was assessed to have anxiousness and/or unhappiness and there were concerns regarding possible trauma from the accident.  He had nightmares almost every night, was "fairly panicked and anxious," and was cautious of going anywhere by himself.  However, he was adjusting well to living with paternal grandparents, doing well in school, and becoming more confident.  L.S. said he wanted to live at paternal grandparents' house, but he also liked being at his parents' house.

Mother separated from Father within one month of the petition.  She visited L.S. randomly and would disappear for days at a time; no one would know where she was, which "distress[ed]" L.S.  When she did visit, the visits were positive.

The juvenile court sustained the petition in April 2021, removed L.S. from Mother's and Father's custody, placed L.S. with paternal grandparents, and ordered supervised visitation and reunification services to include substance abuse treatment and testing.

### C. Reunification Period

Mother did not engage in substance abuse treatment until April 2022—one year after L.S.'s removal.  Throughout the reunification period, L.S. continued to do well in paternal grandparents' home.  He was ultimately diagnosed with posttraumatic stress disorder (PTSD).  With the support of paternal grandparents and the stability of living in their home, L.S. progressed in school and therapy, although he sometimes had setbacks and was negatively impacted by Mother's inconsistency.

#### 1. Six-Month-Review Period

L.S. began therapy in June 2021 and was starting to develop positive coping mechanisms.  His therapist reported he felt safe and happy with paternal grandparents.  He also started kindergarten, which he enjoyed.  He

4

appeared to be adjusting well to school and making friends easily. Throughout this period, Mother continued to be inconsistent in visiting L.S. L.S. described his visits with Mother as "good" but said "I don't see my mommy a lot."

Mother began outpatient treatment at McAlister's North Central Women's Recovery Center (McAlister) in August 2021, but her participation was unsatisfactory, she had multiple unexcused absences, and she continued to test positive. She was discharged in October 2021.

### 2. 12-Month-Review Period

In January 2022, Mother said she was trying to get into detox. She told L.S. that she might not be able to visit for a week or two and told him it was something she needed to do to get him back. L.S. displayed aggressive behavior at school that month. When discussing this in therapy, L.S. explained that Mother was telling him he would be going home soon. He seemed to be grieving the removal from Mother, which he was exhibiting with anger. His therapist reported he was protective of his parents, particularly Mother, and opined that he had an anxious attachment to her. Mother's visits continued to be inconsistent, including late arrivals, cancelations, and no-shows. Her inconsistent visitation impacted L.S.'s mood and caused him to worry and have increased anxiety. When she did visit, the visits were positive.

L.S. continued his therapy where the focus was on separation from Mother and Father since that appeared to be impacting him the most. L.S.'s trauma symptoms improved, in general, but he continued to experience more generalized anxiety and continued to have sleep disturbances. By April 2022, L.S. had begun communicating his feelings better and was doing well with the consistency and structure that paternal grandparents provided. L.S.'s

teacher also noted that the stability and structure contributed to his growth in school. Maternal grandmother reported that L.S. was still very concerned about whether his parents were "okay," especially Mother. And his therapist was still concerned with Mother's inconsistency in his life.

Mother began treatment at McAlister again in April 2022. In June 2022, she reported she was almost two months "clean."

### 3. 18-Month Review Period

During this period, Mother continued to be engaged in treatment and provide negative drug tests. As a result, she began unsupervised visits in August 2022, which took place in the community. However, paternal grandmother expressed frustration that Mother was still inconsistent with her visits. The Agency discussed a consistent visitation schedule with Mother, who agreed it would be helpful.

L.S. reported the unsupervised visits were positive and he would be "okay" with having visits at Mother's home. While L.S. did not have any concern or fear with returning to Mother, he wanted to continue living with paternal grandparents where he had been for over a year and a half. By this time, he started first grade and was still doing well academically and with his peers. He was also still benefiting from therapy. L.S. expressed that he was happy with the stability he had with paternal grandparents and did not want any changes. The Agency recommended terminating reunification services because although Mother made progress in her treatment, she was still very new in her recovery given her long history of substance abuse and was not ready to take on full parenting responsibilities if L.S. were returned to her care.

At the contested 18-month review hearing in October 2022, the court found that returning L.S. to Mother would create a substantial risk of

6

detriment to L.S.'s well-being and did not find exceptional circumstances to extend services beyond the 18-month deadline. It therefore terminated Mother's reunification services and scheduled a section 366.26 hearing.

### D. Permanency Planning Period

During a child family team meeting in February 2023, the participants discussed concerns that L.S. still saw himself as his parents' caretaker and needed reminders to not worry about his parents. Paternal grandfather explained that L.S. was " 'very wary and guarded' " about his parents' feelings and watched for changes in their mood and behavior. He also seemed to be careful about what he said or did not say to Mother because he did not want to hurt her feelings or disappoint her.

For the majority of this period, Mother was having consistent unsupervised visitation with L.S. The visits were positive but at times L.S. wanted the visit to take place at paternal grandparents' home where he felt "more safe." When visits did take place at Mother's home, L.S. had paternal grandmother wait outside rather than leave him alone with Mother. By May 2023, one month before the section 366.26 hearing, Mother once again became inconsistent with her visitation. She was difficult to contact, would not confirm locations or times, would not show up to visits, and rescheduled visits at the last minute.

At Mother's request, the court ordered a bonding study. The psychologist who conducted the study observed Mother and L.S. during a four-hour visit in the community. She found that L.S. "engages in healthy (secure) attachment behaviors toward Mother." The interactions were positive, playful, reciprocal, and appropriate. L.S. seemed relaxed and calm with Mother, and Mother was affectionate and appropriate. The psychologist concluded that "[c]onsidering the beneficial relationship between Mother and

Child, severing contact could be detrimental. Even if not immediately destabilizing, there may be challenges related to negotiating the ambiguous loss that can result where there is a healthy parent-child relationship that is severed without significant reason (e.g., a continuously unhealthy or unsafe parent)." She recommended that the court "consider the substantial, positive relationship observed between the child and his mother when making any determinations regarding the future of both parties."

The Agency reported that there was no doubt L.S. loves Mother and Mother loves him, but they appeared to have more of a best friend relationship rather than a mother-son relationship. While there were periods when Mother was unable to keep in consistent contact, L.S. looked forward to visits, which had been positive, engaging, and fun. During visits, they played, joked around, smiled, and laughed together. However, L.S. ended visits with no distress or emotional dysregulation, and he never asked for Mother when he was hurt or frightened, or between visits.

The Agency assessed that the issues L.S. may experience if Mother's parental rights were terminated did not outweigh the benefits of adoption. Paternal grandparents provided a stable and safe home environment for L.S., who continued to progress in school, extracurricular activities, and therapy. In the past two years in paternal grandparents' care, L.S. became increasingly independent and higher functioning in his daily activities. He also gained confidence and skills to regulate his emotions, set boundaries, and self-advocate. Noting that Mother's visitation recently became sporadic again, the Agency emphasized that L.S. deserved stability, consistency, and structure. When asked, L.S. initially did not know how he would feel if he could not see his parents again and then said he would feel sad and very mad if his parents were no longer part of his life. However, he expressed that he

8

wanted to continue living with paternal grandparents.  Paternal grandparents were committed to adopting L.S.

### 4.  Permanency Planning Hearing

At the section 366.26 permanency planning hearing, the court found that L.S. was generally and specifically adoptable.  Regarding the parent-child relationship exception to adoption, the court noted Mother's visits had been fluctuating shortly before the hearing but nonetheless found that there was sufficient visitation and contact to satisfy prong one.

The court then reasoned the fact that then seven-year-old L.S. spent the first five years of his life with Mother weighed in favor of satisfying prong two.  However, the court noted L.S.'s relationship with Mother was that of a best friend, L.S. did not experience anxiety or dysregulation after visits with Mother, and until recently, L.S. preferred to have visits inside or near paternal grandparent's home where he felt safer.  Additionally, reports that L.S. worried about his parents, saw himself as the caretaker for his parents, watched for changes in his parents' behavior, and took on the role of mediator in the first five years of his life demonstrated parentified behavior, which weighed against finding that prong two was met.  The court also noted L.S. did not ask for Mother when he was hurt or frightened nor asked to see her between visits, which weighed against finding that prong two was satisfied.  On balance, the court found Mother did not satisfy prong two.

In assessing prong three, the court gave "little weight" to the bonding report because of the psychologist's limited observation.  It recognized that terminating Mother's parental rights "could likely have lasting impacts on [L.S.]."  But when considering the benefits of adoption, the court found that severing the relationship would not be detrimental.  Concluding no exception

9

to adoption applied, the court terminated Mother's parental rights to L.S. and ordered the plan of adoption.

## DISCUSSION

Mother contends the juvenile court erred in finding that the beneficial parent-child relationship exception did not apply. We conclude, however, that substantial evidence supports the court's finding that L.S. did not have a substantial, positive, emotional attachment to Mother, and the juvenile court was within its discretion to decline to apply the beneficial parent-child relationship exception.

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]' " (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 (*Fernando M.*).) At a permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or long-term foster care. If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Ibid.*; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) Once the juvenile court finds the child is adoptable, the burden shifts to the parent to demonstrate that a statutory exception applies. (*Id.* at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

One such statutory exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) It applies if "[t]he court finds a

10

compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This exception requires the parent to prove three elements: "1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225 [citing to *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*)].) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, at p. 640, citations omitted.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Here, the juvenile court found Mother satisfied the first element of regular visitation and contact with L.S. The Agency conceded this point below and does so again on appeal.

Turning to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [italics added].) To determine whether the parent has established this element, the court considers factors including the age of the child, the amount of time the child spent in the parent's custody, the positive or negative effect of interaction between parent and child, and the child's particular needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Mother contends there was overwhelming evidence of a positive emotional attachment between L.S. and her such that L.S. would benefit from continuing that relationship. We do not disagree that Mother and L.S. have a meaningful relationship. Seven-year-old L.S. spent the first five years of his life in Mother's care, loves Mother, enjoys his visits with her, and would be sad or mad if she were not part of his life. However, we must affirm the lower court's finding if supported by substantial evidence even though other evidence may support a different result. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) To this point, Mother argues the juvenile court's determination that the negative effect of interaction between her and L.S. outweighed the positive was not supported by the record. We disagree.

First, Mother contends the court's finding that L.S. exhibited "parentified behavior" did not accurately describe the current relationship at the time of the hearing. We acknowledge that the parenting behavior developed during L.S.'s first five years of his life when he lived with Mother and Father. However, those early years shaped L.S.'s relationship with

12

Mother and the negative effect carried on. As recent as February 2023, there was still concern that L.S. saw himself as his parents' caretaker and needed reminders to not worry about them. Paternal grandfather informed the Agency that L.S. continued to worry about his parents, was guarded about their feelings, and watched for changes in their mood and behavior. As such, there was substantial evidence that L.S. still exhibited parentified behavior at the time of the hearing.

Second, Mother argues the fact that L.S. did not ask for her between visits or when he was hurt or frightened, and L.S.'s ability to separate from her without anxiety or distress shows secure attachment rather than a lack of attachment. However, we must indulge all reasonable inferences in support of the court's ruling. (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.) It was reasonable to infer from this evidence that L.S. did not have a significant, positive, emotional attachment to Mother. Moreover, other evidence supports this inference. As of May 2023, there were reports that L.S. still preferred to visit with Mother at paternal grandparents' home where he felt "more safe." Until recently, maternal grandmother stayed in the vicinity of unsupervised visits with Mother because L.S. wanted her to be nearby. When L.S. did have visits at Mother's house, L.S. would have maternal grandmother wait in the driveway until he told her she could leave. L.S.'s therapist also opined that there was an anxious attachment between L.S. and Mother. In sum, Mother's argument that the court should have considered L.S.'s ability to separate from her as evidence of a positive attachment fails.

Finally, Mother claims the juvenile court failed to explain why the negative aspects of the relationship outweighed the positive aspects. However, the court was not required to recite its grounds, reasons, or specific

findings regarding any of the three elements in determining that the parent-child relationship exception does not apply. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Nonetheless, the court correctly explained that interaction between the child and parent will always have some incidental benefit to the child but that is not enough. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [the parent must demonstrate "more than incidental benefit to the child" and "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"].) The court weighed the evidence in finding that L.S. did not have a significant, positive, emotional attachment to Mother. It is not our place to reweigh the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640, citations omitted.)

The third element of the beneficial parent-child relationship exception requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Id.* at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home . . . ." (*Ibid.*)

Mother contends the court's conclusion that severing L.S.'s relationship with her would not be detrimental lacked analysis. But again, the court was not required to recite its grounds, reasons, or specific findings in determining that the parent-child relationship exception does not apply. (*In re A.L.*,

14

*supra*, 73 Cal.App.5th at p. 1156.)  Mother also contends the court abused its discretion in declining to adopt the findings of the psychologist who conducted the bonding study.  Although she contends there was no evidence the report was flawed or inaccurate, the court's basis for giving "little weight" to it was that the psychologist observed Mother and L.S. together for only four hours.  Again, it is not for us to reweigh evidence when evaluating the factual basis for an exercise of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

Nonetheless, the court did not wholly disregard the bonding study.  The court recognized that severing the relationship with Mother "could likely have" impacts on L.S. during his childhood and into adulthood.  However, on balance when considering the benefits of adoption, the court concluded that terminating the relationship would not be detrimental to L.S.—i.e. any harm from terminating the relationship did not outweigh the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  We must affirm the court's determination unless it was arbitrary, capricious, or patently absurd.  (*Id.* at p. 641.)  We cannot say that it was.

This is a difficult case where Mother did have a meaningful relationship with L.S.  However, the outcome is clear when considering that at this point, when reunification services have been terminated, the focus shifts from family preservation to promoting the children's best interest, including the children's interest in a stable, permanent home.  (*Fernando M.*, *supra*, 138 Cal.App.4th at p. 534.)  Given L.S.'s PTSD and other issues stemming from the first five years of his life in Mother's care, stability was crucial for him.  Paternal grandparents provided that and in the two years in their care, L.S. progressed in school, extracurricular activities, and therapy. Mother, on the other hand, was at times inconsistent and unreliable,

15

including canceling, not showing up to, arriving late to, or rescheduling visits at the last minute. This negatively impacted L.S.'s mood and caused him worry and increased anxiety. As recent as May 2023, the month before the section 366.26 hearing, Mother had begun this pattern again. The court noted her recent "fluctuating" visits, and although this did not preclude the court from finding that Mother satisfied the first element of regular visitation and contact, it reasonably supports the court's ultimate conclusion that the benefit of stability provided by adoption outweighed any harm from terminating the parental relationship.

The record here does not support a conclusion that this is an extraordinary case where preservation of the parent's rights should prevail over the Legislature's preference for adoptive placement. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) Accordingly, the court did not abuse its discretion when it declined to apply the beneficial parent-child relationship exception to adoption and terminated Mother's parental rights.

## DISPOSITION

The order is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DO, J.

CASTILLO, J.