Filed 10/30/24  Honor Finance Holdings v. Spireon CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| HONOR FINANCE HOLDINGS, LLC, et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>SPIREON, INC.,<br><br>    Defendant and Appellant. | G063359<br><br>(Super. Ct. No. 30-2021-01178346)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Barry T. LaBarbera, Judge. (Retired judge of the San Luis Obispo Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Ford & Harrison, Daniel B. Chammas and Min K. Kim for Defendant and Appellant.

Raines Feldman Littrell, Robert Shore; Rachlis Duff & Peel, Drew G.A. Peel and Michael Rachlis for Plaintiffs and Respondents.

\*          \*          \*

Plaintiff Honor Finance, LLC (the Company) purchased products from defendant Spireon, Inc. (Spireon) over the Internet. The Company, and its parent entity, Honor Finance Holdings, LLC (Holdings; collectively, plaintiffs) later sued Spireon. Spireon moved to compel their claims to arbitration (the arbitration motion). It claimed the Company had accepted various terms and conditions over the Internet, including an arbitration agreement, prior to making the online purchases.

The trial court denied the arbitration motion on grounds Spireon had failed to produce a signed arbitration agreement. In a prior appeal, we found the lower court had failed to apply the proper law governing contract formation over the Internet. We remanded this case and asked the lower court to determine, among other things, whether the relevant terms and conditions were presented in a sufficiently conspicuous manner to provide constructive notice to the Company.

On remand, the trial court denied the arbitration motion. It found Spireon had not provided "sufficient competent evidence" showing the terms and conditions presented to the Company over the Internet were sufficiently conspicuous. Spireon appeals, but we find the court's ruling is supported by substantial evidence and affirm the order.

FACTS AND PROCEDURAL HISTORY

Most of the facts below are taken from our prior opinion in this matter, *Honor Finance, LLC v. Spireon, Inc.* (Jan. 20, 2023, G061171) [nonpub. opn.] (*Honor Finance*).

I.

BACKGROUND

"The Company was formed in July 2011 to acquire part of a subprime automobile loan portfolio from an unrelated but similarly named

2

company called Honor Finance Corporation (HFC). The acquisition was completed in October 2011. Holdings was formed in September 2011 and was the sole member of the Company. Spireon is a Tennessee corporation that sells global positioning system (GPS) products for the installation in and the tracking of vehicles. Its principal place of business is in Irvine.

"Plaintiffs filed this lawsuit against Spireon in January 2021. Generally, plaintiffs alleged Spireon was involved in an illicit scheme with nonparty Robert DiMeo, who was an officer at HFC. After the Company acquired HFC's loan portfolio, DiMeo became a vice president and the chief operating officer for the Company. He remained employed by the Company until 2018, when his fraudulent activity was uncovered.

"The alleged illicit scheme involved GPS devices, which the Company sold to its borrowers for purposes of tracking and repossessing vehicles if the borrower defaulted. Plaintiffs alleged that between January 2012 and December 2015, DiMeo purchased over 30,000 GPS devices directly from Spireon for roughly $2.3 million using his personal credit card. DiMeo instructed Spireon to invoice a sham company he owned, LHS Solutions, Ltd. (LHS). DiMeo then caused LHS to invoice the Company for the GPS devices at a substantial mark up over the amount that DiMeo had paid Spireon. After receiving payment from the Company, LHS reimbursed DiMeo for his credit card charges and kicked back the profits to DiMeo and his collaborators. One of his collaborators was Michael Walsh, an accountant who performed services for entities controlled by DiMeo. [1]

---

[1] "In May 2020, an indictment was filed against DiMeo and Walsh in the Northern District of Illinois relating to this alleged scheme. They were both charged with 10 counts of mail fraud. (18 U.S.C. § 1341.) Walsh accepted a plea agreement. The status of DiMeo's criminal case is unclear from the record." (*Honor Finance, supra*, G061171.)

"The complaint included e-mail orders made directly from DiMeo to Spireon. It also attached internal Spireon e-mails from 2012 showing that DiMeo requested that 'Honor Finance' be removed from Spireon's invoices because he 'want[ed] no paper trails whatsoever with the name Honor Finance. The goal [was] to have Honor Finance not be liable for anything [so] the name [was] change[d] on the bill to [LHS].'

"The Company discovered DiMeo's alleged scheme in May 2018, and immediately terminated him. However, the Company lost substantial sums of money due to the scheme, among other factors, and ceased operations in September 2018. Holdings lost a $25 million equity investment in the Company. Based on the above allegations, plaintiffs asserted four causes of action against Spireon: (1) aiding and abetting DiMeo's breaches of fiduciary duty, (2) conspiring with DiMeo to defraud the Company, (3) unfair competition under Business and Professions Code section 17200, et seq., and (4) unjust enrichment." (*Honor Finance*, *supra*, G061171.)

II.

THE ARBITRATION MOTION

Spireon moved to compel arbitration of plaintiffs' claims. Generally, it argued the Company had accepted the terms of a subscription services agreement (SSA) when purchasing Spireon's products over the Internet, and the SSA included an arbitration agreement. (*Honor Finance*, *supra*, G061171.) Spireon claimed Holdings was bound by the SSA's terms because it controlled the Company's activities.

"The arbitration motion was primarily supported by a declaration from Michael Callinan, a senior manager of software development at Spireon. [¶] The arbitration motion and supporting evidence explained that since 2010, all buyers of Spireon's GPS devices are required to accept the SSA's

4

terms in order make purchases. Specifically, in 2010, Spireon used a system known as SysDevX that managed customer orders, billing information, and customer account information. Every customer was assigned a unique identification number. Under SysDevX, each customer could only have one user to log in to the system and place orders. The user had to provide an individual name and e-mail address to sign up. The first time a user logged into SysDevX, he or she had to accept the terms of the SSA to proceed any further. Every time the SSA was updated, SysDevX required the user to agree to the new version of the SSA upon logging in. Users were permitted to review the terms of the SSA before accepting them but were not required to do so. SysDevX tracked user acceptances of the various SSA versions, including the user's Internet Protocol (IP) address, the version of the SSA accepted, and the date and time of acceptance.[2]

"Callinan's declaration averred that 'SysDevX has a record of an "Honor Finance" entity as a customer in June 2009.' The Company name is listed as '"Honor Finance,"' and the associated username for the account was 'Gary Little.' In May 2011, the username was changed to 'Rob Dimeo.' On January 13, 2016, the Company name was changed from '"Honor Finance"' to "Honor Finance LLC."' Callinan's declaration . . . attached [a] spreadsheet [(the SysDevX spreadsheet)] to show that users of the 'Honor Finance' account had accepted various versions of the SSA seven times between February 4, 2010, and October 8, 2014.

_____

2 '"An IP address . . . is a '"unique identifier"' that functions '"much like [a] Social Security number[ ] or telephone number[ ],"' each corresponding to '"a specific entity connected to the Internet."'' [Citation.] '"The IP . . . address is unique to a specific computer. Only one computer would be assigned a particular IP address."''' (*Honor Finance, supra*, G061171.)

"The arbitration motion further explained that from October 2014 to May 2015, Spireon migrated the 'Honor Finance' account from SysDevX to a new platform called NSpire Internet of Things (NSpire), which also tracked customer information. NSpire allowed customers to authorize multiple unique users to log in to Spireon's system and place orders. A user needed to provide a name and e-mail address to become an authorized user on NSpire. At the time the Company's account was migrated to NSpire, the last acceptance of the SSA was version 4.2 from SysDevX user "'Rob Dimeo'" on October 8, 2014.

"Like SysDevX, every time the SSA was updated, NSpire required users to agree to the new version when logging in. Users were permitted but not required to review the SSA before accepting its terms. Information relating to a user's acceptance of an SSA version was stored in NSpire, including the username, the user's IP address, the user's e-mail address, the date of acceptance, and the version of the SSA accepted. Callinan's declaration attached a list of the 'Honor Finance' account's authorized users on NSpire (the NSpire user list). It also included a spreadsheet showing all the instances a user associated with the 'Honor Finance' account had accepted a version of the SSA (the NSpire spreadsheet). The NSpire spreadsheet showed 45 different users with Honor Finance e-mail accounts [had] accepted a version of the SSA 81 times between May 5, 2015 and January 14, 2016.

"Spireon's arbitration motion focused on two users that had purportedly accepted multiple versions of the SSA on behalf of the Company. The first was DiMeo. The second was Kurt Koeckritz, who supposedly accepted the SSA's terms on October 16, 2015, and December 4, 2015. Spireon submitted a copy of Koeckritz's LinkedIn profile via a request for

6

judicial notice, which stated he worked for 'Honor Finance' as an Assistant Vice President between April 2010 and May 2018.

"Plaintiffs' opposition and supporting evidence argued Spireon had failed to show the Company had accepted any version of the SSA. To begin, they argued Callinan's declaration lacked foundation. Plaintiffs also asserted that prior to January 13, 2016, when the account name changed to 'Honor Finance LLC,' the 'Honor Finance' account referred to HFC and/or LHS, not the Company. Among other things, the 'Honor Finance' account was created in SysDevX in June 2009, two years before the Company was formed. Evidence indicated HFC purchased GPS devices from Spireon until at least October 2011, and that HFC continued operations after October 2011. Further, there was evidence HFC personnel used 'honorfinance.com' e-mail addresses. Plaintiffs also presented evidence from which it could be inferred that the 'Honor Finance' account was associated with LHS, not the Company, from October 2011 until January 2016.

"As to the SysDevX spreadsheet, plaintiffs' expert . . . stated that of the seven acceptances logged, the associated IP addresses did not show a conclusive link to the Company. The expert likewise opined the NSpire spreadsheet was unreliable. Among other things, the names listed on it did not match the NSpire user list. Further, the NSpire spreadsheet showed the Company's users accepted versions of the SSA in 2020 and 2021, years after the Company had suspended business operations. Further, several persons who accepted versions of the SSA did not have 'honorfinance.com' e-mail addresses and had no clear association with the Company.

"Moreover, plaintiffs asserted Spireon's evidence failed to establish that any NSpire or SysDevX user was authorized to bind the Company to an SSA. They submitted evidence showing DiMeo lacked

7

authority to enter into the SSAs on behalf of the Company, and the Company had not ratified any SSAs he purportedly accepted. Further, it was unclear whether DiMeo had actually accepted the SSA's terms himself. Plaintiffs noted that Spireon's records from SysDevX list the e-mail address for user 'Rob Dimeo' as an e-mail address that appears to belong to Walsh, DiMeo's coconspirator. Walsh does not appear to have ever been employed by the Company. Further, there was evidence linking the street address listed for user 'Rob Dimeo' in SysDevX to 'Michael Walsh & Associates.' Likewise, on the NSpire spreadsheet, some of the entries for user 'Rob Dimeo' list an e-mail address that again appears to belong to Walsh. As for Koeckritz, plaintiffs argued that while the trial court could take judicial notice of the existence of his LinkedIn profile, it could not accept the truth of that document's contents.

"Similarly, plaintiffs maintained there was no evidence showing any NSpire or SysDevX user intended to bind the Company when it accepted the terms of the SSA. There was no evidence showing users knew they were accepting the SSA's terms on behalf of the Company rather than individually. Among other things, the SSA stated the parties entering the agreement were Spireon and 'you,' which plaintiffs argued was ambiguous. They also cited language within certain SSA's suggesting 'you' only referred to the individual user." (*Honor Finance, supra*, G061171.)

"The arbitration motion . . . was heard by Judge Derek W. Hunt, who denied the arbitration motion on grounds the parties had not shown a valid agreement was formed. The trial court issued a brief, single paragraph order explaining, '[t]here was no signature by either side put before the court —not even an electronic or digital signature.'

"Spireon appeal[ed] the order denying the arbitration motion."
(*Honor Finance, supra*, G061171.)

## III.

### SPIREON'S FIRST APPEAL

We reversed the trial court in *Honor Finance*. We stated, "'While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that "'[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract."'" . . . Assent to a contract over the Internet is generally manifested by a user's conduct rather than an electronic signature. '[I]f a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed.'" (*Honor Finance, supra*, G061171.) "'[A] manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the same thing, which occurs only when the website puts the consumer on constructive notice of the contractual terms.'" (*Ibid*.)

We explained that courts "'have identified at least four types of [I]nternet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" (*Honor Finance, supra*, G061171.) "''A 'browsewrap' agreement is one in which an [I]nternet user accepts a website's terms of use merely by browsing the site. A '*clickwrap*' agreement is one in which an [I]nternet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available. A '*scrollwrap*' agreement is like a 'clickwrap,'

9

but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the 'I agree' or 'I accept' button. . . . '*Sign-in-wrap*' agreements are those in which a user signs up to use an [I]nternet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up."'" (*Ibid.*)

"Of these four types of agreements, browsewrap agreements are generally unenforceable, clickwrap agreements are normally enforceable, and scrollwrap agreements are consistently found to be enforceable. [Citation.] 'Sign-in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements.' [Citation.] The enforceability of a sign-in wrap agreement generally depends on the nature of the transaction and the conspicuousness of the notice given to the user." (*Honor Finance, supra*, G061171.)

We found the trial court had erred by focusing on whether the SSA had a signature. "Instead of a signature, Spireon could prove assent by showing it presented the SSA's terms to an authorized agent of the Company, the agent was given sufficient notice of those terms, and then accepted them through his or her conduct. [Citations.] Manifestation of assent could be demonstrated by the agent clicking acceptance of those terms, agreeing to the terms as a condition of creating an account, accepting terms to sign into an account, or other conduct." (*Honor Finance, supra*, G061171.)

Because the trial court had not considered the assent issue, we remanded the case and directed the court to consider several questions: "First, [the court] should determine whether an agent of the Company

10

manifested assent to the terms of the SSA. If so, the court must decide whether the terms of the SSA were sufficiently conspicuous to provide constructive notice to that user. [Citations.] If they were, then the court must review whether the user that accepted the SSA did so on behalf of the Company (as opposed to accepting in his or her individual capacity), and, if so, whether the user had authority to do so." (*Honor Finance*, *supra*, G061171.) We also directed the court to address any other arguments concerning arbitrability or enforceability if necessary. (*Ibid*.)

IV.

REMAND

On remand, the parties filed supplemental briefs and submitted additional evidence. Spireon submitted a declaration from Konstantin Bereznyakov (the Bereznyakov declaration), a technology consultant who had worked for Spireon (and its predecessor) from 2011 to present. In response, plaintiffs submitted a declaration from Erik Rasmussen (the Rasmussen declaration), an information security consultant and expert witness.[3] Rasmussen generally asserted portions of the Bereznyakov declaration were unreliable.

The court held a hearing on the arbitration motion in September 2023, with Judge Barry LaBarbera presiding. The court found Spireon had "showed at least one of [the Company's] agents accepted some version of the SSA." But it concluded that Spireon had not submitted "sufficient competent evidence to show the terms of the SSA were sufficiently conspicuous to

---

[3] Spireon had previously submitted another Bereznyakov declaration with its reply in support of the motion to compel. Likewise, plaintiffs had submitted two declarations from Rasmussen, so his declaration following remand was entitled the "Third Declaration of Erik Rasmussen."

11

provide constructive notice to [the Company's] users. [Spireon] showed a user would have to accept the SSA upon the initial log in and also when the SSA was updated. [Citation.] [Spireon] also provided screenshots that were *recently* created to depict the log in process when a person was required to accept the SSA or an updated version of the SSA."

However, the court explained, "[Spireon] offers no evidence to show these screenshots are what a user would see from 2014 to 2021, the time period [Spireon] contends [the Company's] agents agreed to the terms of the SSA. [Spireon's] evidence does not show whether the applicable SSA appeared as a popup box from 2014 to 2021 like it currently does at the time Bereznyakov created these screenshots. There is no evidence describing how the SSA was presented to a user from 2014 to 2021. There is no evidence to show whether or how Bereznyakov knows how the SSA would appear to the user from 2014 to 2021. The evidence is insufficient to show whether the SSA that included an arbitration provision was a browsewrap, clickwrap, scrollwrap, or sign-in wrap from 2014 to 2021. Accordingly, [Spireon] did not show the arbitration provision was sufficiently conspicuous to provide constructive notice to the user and the Court need not address the remaining issues delineated by the Court of Appeal."

Spireon appeals the court's denial of the arbitration motion. Primarily, it contends the screenshots it submitted were undisputed and sufficient to show that the Company's users were given adequate notice of the SSA's terms. We disagree.

12

DISCUSSION

I.

STANDARD OF REVIEW

The parties dispute the applicable standard of review. Spireon argues for de novo review. Plaintiffs contend the trial court's decision was based on factual issues, so we should apply the substantial evidence standard. We agree with plaintiffs.

"'"There is no uniform standard of review for evaluating an order denying a motion to compel arbitration."' [Citation.] Generally, '"[i]f the court's order is based on a decision of fact, then we adopt a substantial evidence standard."' [Citation.] When . . . the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the question for the reviewing court is whether that finding is erroneous as a matter of law. [Citations.] '"Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"'" (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066–1067; *Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1196 (*Solgen Construction*).)

Here, the trial court found Spireon failed to meet its burden of proof to show the Company's users were given constructive notice of the SSA's terms. Thus, plaintiffs assert we should apply the above substantial evidence standard in assessing the court's ruling. Spireon disagrees. It claims de novo review applies where, as here, "the extrinsic evidence in [a] case consists entirely of written declarations." (*Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83,

89 (*Marcus & Millichap*).) As we explain below, Spireon's proposed review standard is based on a misinterpretation of prior case law and also clashes with Supreme Court precedent.

Spireon cites *Marcus & Millichap* for its proposed standard of review, which, in turn, cites *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663 (*Patterson*).[4] As another court has explained, "*Patterson* relied solely on *Milazo v. Gulf Ins.* Co. (1990) 224 Cal.App.3d 1528, 1534 . . . , and *Milazo*, in turn, relied on *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529 . . . and *Estate of Shannon* (1965) 231 Cal.App.2d 886, 890–891 . . . . Ultimately, it is *Coopers & Lybrand* and *Estate of Shannon* that are the source of the '*Patterson/Milazo* rule' that a reviewing court conducts a de novo review of a trial court's order/findings that are based solely on written evidence." (*Solgen Construction*, *supra*, 99 Cal.App.5th at p. 1197.)

"However, *Coopers & Lybrand* did not hold that a reviewing court may disregard the findings and determinations of a trial court when those findings and determinations are based only on written evidence. [Citation.] Rather, *Coopers & Lybrand* simply stated the rule that interpretation of a contract is a question of law 'unless the interpretation turns upon the credibility of extrinsic evidence.' [Citation.] *Coopers & Lybrand* does not support the '*Patterson/Milazo* rule.' Similarly, *Estate of Shannon* hypothesized: 'But where only the interpretation of written instruments is concerned, unaffected by extrinsic evidence, is not an appellate court, after

---

[4] *Marcus & Millichap* also cited *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1369 for the proposition that de novo review applies to rulings based entirely on written evidence. (*Marcus & Millichap*, *supra*, 68 Cal.App.4th at p. 89.) *Mayhew* cited *Patterson* for this rule. (*Mayhew*, at p. 1369.)

14

studying the briefs on appeal, listening to the arguments of counsel, and thereafter engaging in a full discussion of the problem among the justices, in a more adequately informed position than is the trial judge and therefore better able to interpret the intent of the parties?' [Citation.] *Estate of Shannon* cited no authority in support of its point and then expressly stated that the facts of the case did not involve any issues about extrinsic evidence. [Citation]. In other words, *Estate of Shannon*'s key language is dicta. Therefore, the '*Patterson*/*Milazo* rule' is based on one case that does not actually support the rule and on another case whose relevant language is unsupported dicta. The '*Patterson*/*Milazo* rule' is simply inadequately supported." (*Solgen Construction*, *supra*, 99 Cal.App.5th at p. 1197.)

"Additionally, the '*Patterson*/*Milazo* rule' is contrary to established authority. Our Supreme Court has held that a trial court's judgment or order receives the same deference whether it is based on declarations and written evidence or based on oral testimony." (*Solgen Construction*, *supra*, 99 Cal.App.5th at pp. 1197–1198.) Specifically, it has stated that "'an appellate court should defer to the factual determinations made by the trial court,' regardless of 'whether the trial court's ruling[s are based] on oral testimony or declarations.'" (*People v. Vivar* (2021) 11 Cal.5th 510, 528, fn. 7; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3 [a "trial court's findings . . . based on declarations and other written evidence" are not entitled to any less deference].) Thus, we must defer to the trial court's factual findings in this case.

Spireon also argues de novo review applies where "the evidence of the alleged contract formation consists primarily of *undisputed* screenshots of the website at issue." (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 462, italics added; *Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th

15

855, 863 ["Because the material evidence consists exclusively of screenshots from the Web site and order confirmation e-mail, and the authenticity of these screenshots is not subject to factual dispute, we review the issue de novo as a pure question of law"].)

However, the relevant evidence is not undisputed. As this division has explained, "'undisputed' signifies 'settled' or 'not open to dispute or question.'" (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.) The Bereznyakov declaration contained screenshots purporting to show how the SSA was presented to the Company's users (the screenshots). Plaintiffs submitted the Rasmussen declaration in response. While the Rasmussen declaration did not directly contradict the screenshots, it questioned their accuracy and reliability. In other words, the parties disputed whether the screenshots accurately and reliably depicted how the SSA's different versions were presented to the Company's users.

At best, the screenshots were *uncontradicted* evidence, not *undisputed* evidence. (See *Adoption of Arthur M.*, *supra*, 149 Cal.App.4th at p. 717.) "[T]he trial court is not bound by uncontradicted evidence." (*Ibid.*) It "'is free to *reject* any witness' uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary.'" (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 368.) Accordingly, de novo review does not apply where evidence is only uncontradicted. (*Adoption of Arthur M.*, *supra*, 149 Cal.App.4th at p. 717.) Since that is the case here, de novo review does not apply.

II.

SPIREON'S EVIDENCE

The trial court found Spireon had not met its burden of showing the SSA's terms were sufficiently conspicuous to provide constructive notice

16

to the Company's users. To prevail on appeal, Spireon must show its

"""evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a

character and weight as to leave no room for a judicial determination that it

was insufficient to support a finding.'""" (*Fabian v. Renovate America, Inc.*,

*supra*, 42 Cal.App.5th at pp. 1066–1067; *Solgen Construction*, *supra*, 99

Cal.App.5th at p. 1196.) It has not met this standard.

The screenshots were attached to the Bereznyakov declaration as

exhibits D, M, N, and O. The Bereznyakov declaration stated, "The first time

a customer logged in to the [SysDevX] system, the user was required to agree

to the terms of the [SSA] to proceed any further. Every time the SSA was

updated and a new version was in effect, a user was required to agree to the

new version of the SSA when logging in. The user was always permitted to

review the terms of the SSA before accepting its terms." "Based on Spireon's

records pulled from SysDevX, authorized users of [the Company's alleged

account] accepted the terms of the SSA a total of 7 times . . . ; and the last

version of SSA accepted by [the Company's purported account on SysDevX]

was 4.2. . . . Attached hereto as Exhibit D are screenshots I created showing

the login process that a customer was required to go through when a

customer logged in to the SysDevX system and version 4.2 of the SSA first

when [*sic*] into effect or was a new update and was a new version that was

now in effect." (Fn. omitted.)

The Bereznyakov declaration then explained that between

October 2014 and May 2015, the Company's purported account was migrated

from SysDevX to NSpire. "After Nspire [*sic*] was in place, every time the SSA

was updated and a new version was in effect, a user was required to agree to

the new version of the SSA when logging in to the system. When NSpire was

in effect, the user was always permitted to review the terms of the SSA before

17

accepting its terms. If a user did not agree to the SSA, the user could not place any orders for GPS products from Spireon, or otherwise use the ordering system."

The Bereznyakov declaration showed 45 different users with an "'honorfinance'" e-mail account accepted the terms of versions 4.2, 9.15, and 9.16 of the SSA through NSpire between May 2015 and January 2016. The Bereznyakov declaration attached as exhibits M, N, and O, "screenshots I created showing the login process that a user was required to go through the first time a user logged in to the NSpire system when" versions 4.2, 9.15, and 9.16 were "in effect or . . . a new update and . . . a new version that was now in effect."

The Rasmussen Declaration contained a section specifically addressing the screenshots. As to exhibit D (version 4.2 of the SSA on SysDevX) Rasmussen stated, "The primary concern I have about these exhibits is the unreliable nature of the evidence offered. . . . [T]here is no date or time associated with these screenshots, unlike some of the other exhibits, nor is there any reference in the screenshots to any of Bereznyakov's parameters, namely that a) version 4.2 was in effect or b) there was a new update or version in effect [citation]. Moreover, as the declarant evidently generated the screenshots recently . . . (the copyright notice on the first page of the exhibit says '2023') there is no possible way to link it back to a procedure in place years ago." Rasmussen also noted, "[a] reader does not even know what website or Uniform Resource Locator ('URL') [Bereznyakov] was accessing to authenticate the [SysDevX] system since there is no location bar or web address bar present in the exhibit." Rasmussen made the same critiques of the screenshots purporting to show the SSA versions provided to users on NSpire (exhibits M, N, and O of the Bereznyakov declaration).

18

Spireon contends there is no material dispute concerning the accuracy of the screenshots. This is inaccurate. Plaintiffs argued the screenshots were unreliable based on the Rasmussen declaration. The court agreed. It was not persuaded the screenshots accurately depicted how the different SSA versions were presented to the Company's users during the relevant timeframe. Specifically, it found the screenshots were not "sufficient competent evidence" because 1) they were recently created; 2) no evidence was offered showing the screenshots were what users would have seen between 2014 to 2021; 3) the Bereznyakov declaration did not show whether the applicable SSAs appeared as popup boxes from 2014 to 2021 as they did in the screenshots; and 4) there was no evidence describing how the SSA was presented to users from 2014 to 2021.

"[W]here uncontradicted testimony has been rejected by the trial court, it 'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.'" (*Adoption of Arthur M.*, *supra*, 149 Cal.App.4th at p. 717.) Given the concerns set forth in the Rasmussen declaration, the screenshots do not meet this standard. The court could reasonably disbelieve their accuracy. We have not been cited any other evidence in the record showing how the SSA's terms were presented to the Company's users. Without such evidence, the trial court could not assess whether they were sufficiently conspicuous to the Company's users. As such, we find no error in the court's ruling and do not address the parties' remaining arguments.

## DISPOSITION

The order is affirmed. Plaintiffs are entitled to their costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

DELANEY, J.

GOODING, J.