Filed 1/30/26  In re K.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re K.M., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.E.,<br><br>        Defendant and Appellant. | A173984<br><br>(City & County of San Francisco Super. Ct. No. JD22-3253) |

K.E. (Mother) appeals from an order terminating her parental rights over her daughter, K.M.  She argues that the order must be reversed because the juvenile court erred in declining to apply the beneficial relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1]  She further contends that inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; see § 224 et seq.; ICWA) was inadequate.  We conditionally reverse the order and remand for the limited purpose of compliance with ICWA.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

# I. BACKGROUND

### A. Detention Through Six-Month Review

In September 2022, the San Francisco Human Services Agency (Agency) received a referral from a mandated reporter stating that then one-year-old K.M. had been brought to an emergency room after displaying symptoms of drug ingestion. After a positive toxicology report revealed that K.M. had cocaine in her system, the Agency filed a section 300 petition alleging that K.M. was at risk of serious physical harm because Mother failed to adequately protect her, and that K.M.'s father, who lived separately from Mother, was unable to protect K.M. from Mother's neglect.

The juvenile court declared K.M. a dependent, removed her from her parents' care, and placed her with a relative. Mother was to receive supervised visitation.

In its jurisdiction/dispositional report and an addendum report filed in February 2023, the Agency sought a continuance of the jurisdiction and disposition hearing. The addendum report explained that while Mother was ruled out as the source of the drugs ingested by K.M., she could not explain how K.M. obtained the drugs, and the Agency needed time to inspect Mother's residence and identify safe adults to care for K.M.

In an addendum report filed in March 2023, the Agency recommended the court sustain the allegations in the petition. Mother had agreed to a "safety plan" to ensure K.M. did not have access to drugs and was supervised only by certain individuals. K.M.'s caregiver agreed to facilitate visits with the parents.

Another addendum report filed in March 2023 recommended that the case be transferred to Contra Costa County, where Mother currently resided.

2

At the contested jurisdiction/disposition hearing, the juvenile court sustained the amended[2] petition, declared K.M. a dependent, and ordered reunification services and supervised visitation for both parents. The court also transferred the case to Contra Costa County.

A few months later, in July 2023, the case was transferred back to San Francisco County after the social worker learned that Mother was living with K.M.'s maternal grandfather in San Francisco.

In a status review report filed in December 2023, the Agency recommended the termination of reunification services for both parents. The report explained that neither parent had completed any of their court-ordered services, and it was difficult to maintain regular contact with them, as they "have moved from one city to another so much and been so unstable over the year."

A maternal aunt, S.S., expressed interest in adopting K.M. K.M. was placed in the care of S.S. in January 2024.

After the six-month review hearing was continued, the Agency filed an addendum report in February 2024, again recommending the termination of reunification services. The social worker reported having a hard time maintaining regular contact with the parents, and minimal progress had been made on their case plan. Additionally, Mother had been "very inconsistent" with visitation.

---

[2] The section 300 petition was amended to reflect that both cocaine and a medication called Haloperidol were found in K.M.'s system, that Mother had tested negative for those drugs, that the maternal grandparents had a history of drug use or possession, and that Mother was struggling to provide for K.M.'s basic needs.

In March 2024, Mother filed a trial brief objecting to the termination of reunification services on the ground that the Agency failed to provide her reasonable services. She also argued that the Agency improperly delegated all authority over visitation to K.M.'s caregiver and did not offer her any visits between September 2023 and November 2023.

After the contested review was continued, the Agency filed an addendum report recommending that Mother receive a 30-day extended visit with K.M. Mother had made "significant" progress on her case plan and had been more consistent with visitation in the last two months. The Agency stated it would offer Mother six additional months of reunification services if her 30-day trial went well.

At a subsequent hearing, the court granted the Agency discretion to give Mother unsupervised and overnight visitation.

The Agency filed an addendum report in May 2024, recommending that reunification services be terminated and a section 366.26 hearing be set. The report explained that, per S.S., Mother had been "very 'hit or miss' " with visitation. The report listed 12 visitation dates that Mother had missed in the last three months.

In a subsequent addendum report, the Agency again recommended the termination of reunification services. According to the report, "it has continued to be extremely challenging to meet and communicate with both parents." S.S. reported that Mother had missed half of her visits with K.M. since mid-March 2024. Mother later told the social worker that S.S.'s information was inaccurate though Mother did not provide further comment.

At the review hearing in July 2024, the court terminated Mother's reunification services and set a section 366.26 hearing for November 2024.

***B. The Section 366.26 Proceedings***

In October 2024, the Agency filed a section 366.26 report recommending that adoption be approved as K.M.'s permanent plan and that parental rights be terminated. Mother had missed "almost all of her visits" with K.M. and would only see her "sporadically." When K.M. was initially detained, the Agency tried to schedule supervised visits "in the community" but Mother did not complete an intake. The Agency then attempted to schedule visits that would be supervised by K.M.'s caregiver, but Mother "did not follow through." Because visits with Mother had been "very minimal," K.M. was "not attached" to Mother, and their relationship was "minimal."

The Agency determined that K.M. was likely to be adopted. She had been in S.S.'s care for nine months and had adjusted well to the family. S.S. wished to adopt K.M.

The section 366.26 hearing was continued multiple times. The Agency filed an addendum report in April 2025, reiterating that Mother's visitation with K.M. had been inconsistent. S.S. provided the social worker with a list of the dates on which visits occurred between July 2024 and March 2025. The list showed that Mother visited K.M. one to three times a month, for a total of 15 visits. S.S. said the visits usually happened when she contacts Mother "and not the other way around." The social worker also reported that she heard K.M. refer to S.S. as "mommy" and that K.M. called Mother by her first name.

The Agency filed another addendum report in June 2025 with no change in its recommendation. According to the report, S.S. had to call the police in late April because Mother took K.M. to her apartment and refused to return her. Before that visit, Mother had not seen K.M. since mid-March, and S.S. had to reach out to Mother about visiting K.M.

5

The report further explained that Mother had been inconsistent with visiting K.M. "since the beginning of the case." Early in the case, Mother had " 'limited phone contact' " with K.M., and K.M.'s caregiver usually initiated that contact. Mother had a " 'formal' " visitation schedule with visits supervised by a " 'tech,' " but by March 2023, she " 'had been taken off the schedule' " after missing " 'a bunch of visits.' " In June 2023, K.M.'s prior caregiver reported that Mother did not attend any formal visits after the case was transferred to Contra Costa County. They would see each other during family gatherings, which was difficult for K.M., and she often became " 'dysregulated' " after the meetings.

At the time of the report, K.M. had lived with S.S. for 16 months, and she looked to S.S. for emotional support and to meet her daily needs.

Mother filed a pretrial statement contesting the recommendation to terminate her parental rights. She argued that she had regularly visited K.M. "to the extent made possible by the current caregiver, given the Agency's lack of involvement in arranging and supervising visitation" for nearly the entire case. She further asserted that she had a beneficial relationship with K.M. and that K.M. would benefit from continuing that relationship.

The contested section 366.26 hearing was held on June 16, 2025. At that time, K.M. was almost four and one-half years old. The court admitted into evidence the Agency's section 366.26 report and its addendum reports filed in April and June 2025. The court also admitted into evidence two exhibits submitted by Mother, a "compilation of delivered service logs" and text messages that Mother exchanged with S.S. between January 2024 and April 2025. Mother and a social worker testified at the hearing.

6

### 1. The Social Worker's Testimony

Taniuska Navarro was assigned to this case in September 2024, after reunification services were terminated. She testified that K.M. had been out of Mother's care since she was 15 months old and had been with her current caregiver, S.S., for the past 16 months.

When Navarro was assigned to the case, the Agency had no "formal" visitation; visits were being scheduled with the caregiver. Both S.S. and K.M.'s previous caregiver reported that for "the majority of the time," they had to reach out to Mother to see if she wanted to visit K.M. Visitation "has been very infrequent."

Navarro testified that after Mother failed to return K.M. from a visit in April 2025, S.S. was no longer comfortable supervising visits. Thus, in May 2025, Navarro attempted to schedule an Agency-supervised visit but was not able to reach Mother, and Mother did not call to set up a visit.

According to Navarro, S.S. reported that Mother visited K.M. one to three times a month between July 2024 and April 2025, for a total of 15 visits. Visits would be about three to four hours at the park. If Mother had attended all visits to which she was entitled during that time period, she would have had 46 visits with K.M.

Navarro testified that K.M. had a positive relationship with S.S. K.M. "runs towards [S.S.]. She calls her mommy. She kisses her. She hugs her." In contrast, K.M. calls Mother "by her name, so it is basically a friend or a cousin or maybe an aunty." Navarro said she did not believe that K.M. would suffer any negative impact or emotional instability if visits with Mother were terminated.

On cross-examination, Navarro confirmed she had received information indicating that Mother sometimes picked K.M. up from daycare on days she

did not have a scheduled visit. Navarro also acknowledged that she never supervised a visit between Mother and K.M. or saw them interact. When asked if she had "direct" knowledge of the "quality" of Mother's relationship with K.M., Navarro said that when she was visiting K.M., she heard K.M. refer to Mother by her first name.

### 2. *Mother's Testimony*

Mother testified that she started coordinating visits directly with S.S. about a year ago. Since then, she would get K.M. every weekend except for those weekends that S.S. had plans with K.M. She did not specify how often S.S. had weekend plans. Mother's weekend visits with K.M. would be unsupervised, though Mother knew that the court ordered only supervised visitation. Mother further testified that she picked K.M. up from school every Tuesday for about two months. She later stated that when she could no longer pick K.M. up from school on Tuesdays, "that is when [she] would get [K.M.] every weekend."

Mother submitted text messages from January and April that were between her and S.S. She said she always had to reach out to S.S. about visiting K.M.

Regarding her relationship with K.M., Mother testified that K.M. called her "mommy." On visits, they would watch movies, cook, color, and do nails, or they would go to the park. "We do all the fun stuff she wants to do." At bedtime, Mother would give K.M. a bath, and they would "chill and watch movies and things." When K.M. had to return to S.S., she "cries and tells me she wants to stay and that she doesn't want to leave me." According to Mother, K.M. is always happy to see her and always calls her "mom" or "mommy."

8

Since late April 2025, Mother saw K.M. once "in the neighborhood." She said that she called and texted S.S. to visit K.M. but S.S. never responded.

### 3. Trial Court's Ruling

K.M.'s counsel joined in the Agency's recommendation to terminate parental rights. Mother's counsel did not contest K.M.'s adoptability but argued that visitation between Mother and K.M. should continue. The juvenile court found it likely that K.M. would be adopted, found that neither parent had met their burden to show the beneficial relationship exception applied, and terminated both parents' parental rights.

## II.    DISCUSSION

### A. Beneficial Relationship Exception

Mother argues that the juvenile court erred in declining to apply the beneficial relationship exception under section 366.26, subdivision (c)(1)(B)(i). We disagree.

### 1. Governing Principles

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852 (*J.D.*).) At this hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534, superseded by statute on other grounds as stated in *In re K.H.* (2011) 201 Cal.App.4th 406, 417–418.) "Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be

9

detrimental to the child under one of the exceptions." (*Ibid.*; § 366.26, subd. (c)(1)(A), (B)(i)–(vi).)

One of the exceptions to the preference for adoption is the beneficial relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) To establish that the beneficial relationship exception applies, the parent bears the burden of proving the following elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), italics omitted.) On appeal, we apply the substantial evidence standard of review to the first two elements, which are "essentially . . . factual determination[s]." (*Id.* at pp. 639–640.) However, we review "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent"—for abuse of discretion. (*Id.* at p. 640.)

Because Mother argues that the court erred in concluding she had not met her burden of proof, the more precise question is "whether the evidence compels a finding in favor of the [parent] as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7; see *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1153.) We ask "whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528.)

### 2. *Regular Visitation*

Mother argues that she proved she had regular and consistent visits with K.M. We disagree. Substantial evidence supports the court's finding on the first prong—that visitation was infrequent and inconsistent over the life

10

of the dependency case. In other words, the court determined that Mother failed to meet her burden to show regular visitation and contact with K.M. to the extent permitted by the court order. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders' "].)

Mother contends the juvenile court's finding of inconsistent visitation was based on inaccurate and incomplete Agency reports and "one-sided caregiver evidence."[3] (Boldface and capitalization omitted.) Specifically, she contends her testimony established that she had unsupervised weekend visits with K.M. that were not reported to the Agency. She claims that when she informed the social worker that S.S.'s account of visitation was inaccurate, the social worker did not investigate the matter. Mother also asserts that the text messages she admitted into evidence at the section 366.26 hearing exemplifies the inaccuracies in the Agency reports because the messages show that additional visits likely occurred. Mother further notes an inconsistency in the Agency reports in that a May 2024 report stated that Mother had missed only two visits after she and S.S. agreed on a visitation schedule, while an October 2024 report stated that Mother had only seen K.M. " 'on a few occasions' " after K.M. was placed with S.S.

Mother is essentially asking us to reevaluate the credibility of witnesses and reweigh the evidence. This is not our role. On appeal, "a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a

_____

[3] Mother clarifies in her reply that her argument is not that the Agency reports are unreliable because they are based on information from K.M.'s caregivers but rather that her evidence demonstrated the unreliability of the reports.

single witness is sufficient" to uphold a judgment. (*Ibid.*; see *In re S.A.* (2010) 182 Cal.App.4th 1128, 1148.) Testimony is inherently improbable only if it is physically impossible, or its falsity is apparent without resorting to inferences or comparing it to other evidence except judicially noticeable facts. (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728–729.)

Here, the Agency's evidence regarding the consistency and frequency of visitation is not inherently improbable on its face. The single discrepancy that Mother identifies in the Agency reports does not mean the Agency's evidence as a whole meets this standard. "[I]nconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court." (*In re S.A.*, *supra*, 182 Cal.App.4th at p. 1149; see *In re John F.* (1994) 27 Cal.App.4th 1365, 1378 ["even if the [agency's] assessment is incomplete in some respects," the "deficiencies will go to the weight of the evidence"].) Moreover, we would have to resort to inferences or deductions to conclude that the Agency reports were incomplete based on the text messages cited by Mother because the text messages do not establish that additional visits actually occurred. Rather, they show Mother asking to see K.M. and S.S. agreeing to the visits.

As support for her substantial evidence challenge, Mother cites *J.D.*, *supra*, 70 Cal.App.5th 833 for the proposition that an agency's reports should provide "objective, disinterested information" (*id.* at p. 861), but she quotes that language out of context. The *J.D.* court reversed the termination of parental rights because it could not be certain that the juvenile court, in determining whether the second element of the beneficial relationship exception was satisfied, did not consider factors deemed improper by the California Supreme Court in *Caden C.*, *supra*, 11 Cal.5th 614, which was published while the appeal was pending. (*J.D., supra*, 70 Cal.App.4th at

p. 854.) In conducting its analysis, the appellate court noted that the agency "provided very little information in its prior reports during the case about the quality of [the parent's] relationship with [the child]." (*Id.* at p. 860.)

The *J.D.* court went on to state, however, that "it was not the agency's burden to disprove the existence of the beneficial relationship exception—the burden of proof on this issue was squarely on mother. [Citation.] Moreover, there is tension in the case law concerning the extent to which the agency must address facts pertinent to the beneficial relationship exception in the section 366.26 report itself. We express no opinion here about the adequacy of the agency's section 366.26 report." (*J.D.*, *supra*, 70 Cal.App.5th at p. 861.) Thus, the *J.D.* court did not reverse the order terminating parental rights for the inadequacy of the agency reports. The case therefore does not support Mother's claim that reversal is required here for that reason.

In her reply, Mother asserts that she is not asking this court to reweigh the evidence. Rather, she is claiming that her evidence is " 'uncontradicted and unimpeached,' " compelling a finding that she met her burden as a matter of law. We disagree. Mother's testimony that she had unsupervised weekend visits with K.M. is contradicted by Navarro's testimony that visits were infrequent and supervised. Moreover, "[a] trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043; see *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717 ["the trial court is not bound by uncontradicted evidence"].) In this case, the juvenile court could have rejected Mother's testimony on the ground that she was not a disinterested witness. (See *Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579 [" ' "[i]n passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider their interest in

13

the result of the case, [and] their motives" ' "]; *South Bay Transportation Co. v. Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 657 [while "[u]ncontradicted testimony should not be arbitrarily rejected by the fact finder, . . . it may be self-impeaching and warrant disbelief for a number of reasons, such as . . . obvious bias"].)

Even if we were to credit Mother's documentary evidence as irrefutable proof that Mother "informally arranged unsupervised visitation" with S.S., we would find no grounds for reversal. The text messages admitted into evidence show S.S. agreeing to two visits that were not reported to the Agency and Mother asking to see K.M. on another date with no response from S.S. The service logs show that Mother "sometimes" picked K.M. up from daycare. At most, this evidence shows that S.S. may have omitted a few visits from her count and failed to report that Mother occasionally picked K.M. up from daycare. It does not refute the evidence that "most often times" it was the caregiver reaching out to Mother about visitation and that Mother missed dozens of scheduled visits with K.M. in the year leading up to the section 366.26 hearing. The juvenile court had discretion to credit those portions of the Agency's evidence even if it believed other portions to be false or inaccurate. (See *In re Lopez* (2023) 14 Cal.5th 562, 591.)

Further, the trial court expressly concluded that even if it credited Mother's testimony about recent overnight visits, it would still find that visitation had not been regular.[4] Substantial evidence supports this finding. At the time of the section 366.26 hearing, K.M. had been out of Mother's care

---

[4] Based on this comment by the juvenile court and the substantial evidence supporting the court's finding that visitation had not been regular over the life of the case, we reject Mother's argument that the court discredited her testimony for an improper reason because any such error was harmless.

14

for nearly three years. Mother initially had formal supervised visitation but was " 'taken off the schedule' " after missing " 'a bunch of visits,' " and she failed to complete an intake form for supervised visits "in the community." Thereafter, the Agency tried to schedule visits that would be supervised by K.M.'s caregivers, but the visits were infrequent and inconsistent aside from two months in 2024 when Mother missed only two visits. Mother's testimony regarding her weekend visits with K.M. was limited to the last 10 months or so of this three-year period and did not specify the frequency of those weekend visits. On this record, we cannot conclude that the juvenile court erred in finding Mother failed to " 'visit consistently' " to " 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Finally, Mother contends the juvenile court improperly focused on "older evidence" of her visitation patterns instead of the more recent evidence of her "consistent and meaningful contact" with K.M. We disagree. The court looked "over the life of this case" to determine whether Mother visited K.M. consistently and to the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) This was proper. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 554 [visitation consistent near the section 366.26 hearing, but sporadic overall, is insufficient to meet the first prong of the beneficial relationship exception]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [significant lapses in visitation fatally undermines any attempt to finding beneficial parental relationship exception].) Mother does not provide any authority to the contrary.

Accordingly, we affirm the juvenile court's finding on prong one of the beneficial relationship exception.

### 3. *Beneficial Relationship*

Even if there had been sufficient visitation, the record does not show Mother had a beneficial relationship with K.M.  To satisfy the second prong of the beneficial relationship exception, the juvenile court is required to examine the record to ascertain whether the parent has proven by a preponderance of the evidence that "the child has a *substantial*, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Caden C.*, *supra*, 11 Cal.5th at p. 636, italics added.)  The focus is on the child, and the factors to be considered are:  (1) the age of the child, (2) " 'the portion of the child's life spent in the parent's custody,' " (3) " 'the "positive" or "negative" effect of interaction between parent and the child,' " and (4) " 'the child's particular needs.' "  (*Id.* at p. 632.)

In finding that Mother had not met her burden on the second element, the juvenile court noted that K.M. was young, had spent half her life outside of Mother's care, and had lived with S.S. for about 16 months, and that there was evidence that Mother's relationship with K.M. "[was] minimal, that there is no attachment, and that the child would not be negatively affected by not seeing [Mother]."  The court accepted Mother's testimony "that the visits go well and that the child enjoys the visits" and does not want them to end, but it concluded "on balance" that Mother had not satisfied the second prong because she had not established "an emotional attachment where the child views the parent as more than a mere friend or playmate."

In arguing to the contrary, Mother focuses on only one of the above factors—the positive effect of interaction between her and K.M.  She says she demonstrated that she had a loving, parental relationship with K.M. based on her testimony describing the activities she and K.M. would do during

16

weekend visits and her testimony that K.M. called her "mommy" and would cry at the end of visits and say she did not want to leave. This evidence does not compel a finding on the second element as a matter of law.

To avoid termination of parental rights, Mother must "do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that [they] find their visits pleasant." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "Friendly or affectionate visits are not enough." (*In re G.H.* (2022) 84 Cal.App.5th 15, 25; see *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].)

"A positive attachment between parent and child is necessarily one that is not detrimental to the child but is *nurturing* and provides the child *with a sense of security and stability*," and "an emotional attachment is one where the child views the parent as *more than* a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, italics added.)

Even assuming, as the juvenile court did, that K.M. generally enjoyed her visits with Mother and was sad when they ended, Mother's testimony does not *compel* the conclusion that K.M. viewed her as more than a friend and had a " 'significant' " emotional attachment to her. (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re M.V.* (2023) 87 Cal.App.5th 1155, 1185 ["the second element is not, 'Is there a bond?' "].) After all, it is undisputed that Mother had limited contact with K.M. for approximately half of K.M.'s life, if not more. (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1073–1074 [noting that, in affirming termination of parental rights, the minor hardly knew mother after being detained at age two and spending nearly four years in

17

foster care].)  Even if the court credited Mother's testimony about recent overnight visits, it is unclear from the record whether those visits occurred often enough to give Mother the opportunity to provide K.M. with a sense of stability and security.  (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["[t]he significant attachment from child to parent" usually "arises from day-to-day interaction, companionship and shared experiences"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 467–468 [while evidence showed visits with the minor "went well," other evidence showed the minor had "spent relatively few hours visiting with Mother, versus many hours being parented by the foster family"].)

Additionally, there was evidence that K.M. was not negatively affected by the lack of contact with Mother, "act[ed] rebellious" after visits with Mother, and looked to S.S. to meet her daily needs, and that K.M. had behavioral issues that improved after being placed with S.S.  The court could reasonably infer from this evidence that any attachment K.M. had to Mother was not substantial or positive.  (See *In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230 ["A positive attachment between parent and child is necessarily one that is not detrimental to the child"]; *In re J.C.* (2014) 226 Cal.App.4th 503, 533 [while there was evidence that the child was affectionate with the mother, the child "easily separated from Mother at the conclusion of visits, and readily returned" to her caregiver, and "[m]any toddlers are cuddly, effusively loving, and affectionate"].)  In reviewing factual determinations for substantial evidence, it is not our job to " 'reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Mother further argues that the juvenile court erroneously relied on social worker Navarro's testimony in concluding that K.M. had no

18

attachment to Mother. Mother reasons that Navarro never personally observed her and K.M. interacting with each other, and thus Navarro's testimony on the nature of their relationship was speculative and could not constitute substantial evidence. We reject this argument. The evidence shows that Navarro had observed K.M. on multiple occasions when she visited K.M. at daycare and at S.S.'s home. Navarro also had information from S.S. and the prior social workers assigned to the case about Mother's inconsistent visitation with K.M. throughout the dependency period, and she heard K.M. refer to Mother by her first name. Thus, Navarro had a basis for her conclusions that K.M. would not be negatively affected by the termination of visitation and that K.M.'s relationship with Mother was "minimal."

Further, to the extent the juvenile court may have improperly relied on Navarro's assessment of Mother's relationship with K.M., we review rulings, not reasoning. (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1271.) In this case, the Agency reports and the exhibits admitted into evidence establish that many of the *Caden C.* factors—including K.M.'s age and the portion of her life spent out of Mother's care—weigh against a finding in favor of Mother on the second element of the beneficial relationship exception. Therefore, even if part of the court's reasoning may have erroneously considered Navarro's opinions, reversal is nonetheless not warranted because substantial evidence supports the court's conclusion that Mother had not satisfied the second element.

Mother again relies on *J.D.*, *supra*, 70 Cal.App.5th 833 for her substantial evidence challenge, noting that the *J.D.* court stated it was "not appropriate" that the agency provided "very little information in its prior reports . . . about the quality of mother's relationship with [the child] or even the nature of her interactions with him during visitation." (*J.D.*, at p. 860.)

19

As previously discussed, however, the *J.D.* court did not determine whether reversal was required for the inadequacy of the agency's reports. (*Id.* at pp. 840, 861.) Thus, the case does not support Mother's argument that the juvenile court erred in relying on Navarro's testimony.

In sum, we conclude the juvenile court could reasonably find on this record that Mother failed to show K.M. had a "substantial, positive, emotional attachment" to her. We need go no further. (*Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 322, fn. 10 [a parent's failure of proof on any one of the three elements of beneficial relationship exception is fatal].)

## B. ICWA Inquiry

Mother contends the juvenile court's finding that ICWA did not apply was based on an inadequate inquiry. As the Agency concedes, this point is well taken.

Under ICWA, the juvenile court and the Agency have an "affirmative and continuing duty to inquire" whether K.M. is or may be an Indian child. (§ 224.2, subd. (a).) Because this duty is a continuing one, a juvenile court has a *present* duty of inquiry even if it previously found a child was not an Indian child and that order has become final. (See *In re Isaiah W.* (2016) 1 Cal.5th 1, 10; *In re Michael V.* (2016) 3 Cal.App.5th 225, 233–234.) The duty of inquiry includes asking not only the child and parents, but also "extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.) This duty of inquiry " 'continues throughout the dependency proceedings.' " (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1132.)

The September 2022 detention/jurisdiction report showed that the social worker asked Mother and K.M.'s father whether they have Native American ancestry. They reported no Native American ancestry.

At the detention hearing in September 2022, Mother's counsel informed the juvenile court that Mother said "she might have some Native American Indian ancestry." K.M.'s father also informed the court of his belief that he had Native American ancestry on his side of the family, and he said his aunt may have relevant information. Later in the hearing, Mother's counsel stated that Mother "now says she does not believe she has any Native American Indian ancestry." The court nonetheless ordered the Agency to conduct further inquiry.

The November 2022 jurisdiction/disposition report stated that K.M.'s father said he was not aware of any family members who are registered members of a tribe, lived on a reservation, received services from a tribal agency, or attended an Indian school. Mother reported no Native American ancestry.

At the March 2023 jurisdiction/disposition hearing, the juvenile court found that ICWA did not apply. The next day, the court ordered the case transferred to Contra Costa County, and the transfer order stated that ICWA applied to the case. When the case was transferred back to San Francisco County, the transfer order stated that the court had not yet determined whether ICWA was applicable. It does not appear from the record that the court made any additional ICWA findings.

The record shows that the Agency was in contact with multiple relatives, including a paternal cousin and a maternal aunt, and was aware of the existence of a few other relatives, including K.M.'s paternal grandfather.

21

There is no indication the Agency sought information from them about possible Native American ancestry.

In sum, although the Agency had the names and contact information of additional relatives, the record indicates that the Agency contacted only Mother and K.M.'s father about possible Native American ancestry.  This inquiry did not satisfy the requirement of inquiry of extended family members and others with an interest in K.M. to determine whether she might be an Indian child.  (See *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566.)

As the parties also agree, in these circumstances, the appropriate remedy is a conditional reversal for the Agency to carry out an adequate inquiry under ICWA.  (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

### III.   DISPOSITION

The order terminating parental rights is conditionally reversed.  The matter is remanded to the juvenile court for compliance with ICWA's inquiry and notice requirements.  If the juvenile court finds there has been an adequate further inquiry and concludes ICWA does not apply, the court shall reinstate its order terminating parental rights.  If the juvenile court concludes ICWA applies, it shall proceed in accordance with ICWA and California's implementing provisions.  (See *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

_____
LANGHORNE WILSON, J.


WE CONCUR:


_____
HUMES, P. J.


_____
SMILEY, J.


*In re K.M.* / A173984